Frank ADKINS; Robert Kean; Federico Montinez; John D. Johnson; Jerry Kahklen, et al., Claimants–Appellants,

v.

TRANS-ALASKA PIPELINE LIABILITY FUND, Defendant–Appellee.

No. 95–35291.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 17, 1996.

Decided Nov. 21, 1996.

Richard A. Jameson, Richard A. Jameson & Associates, Anchorage, AK, and Craig D. Ginsburg, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, for claimants-appellants.

A. Stephen Hut, Jr., Wilmer, Cutler & Pickering, Washington, DC, for defendant-appellee.

Before: KOZINSKI and LEAVY, Circuit Judges, and SCHWARZER,[1] Senior District Judge.

SCHWARZER, Senior District Judge:

In 1989, the EXXON VALDEZ ran aground, spilling millions of gallons of oil into Prince William Sound. On this appeal, Alaska businesses and property owners claiming damage from the oil spill challenge the denial of their claims by the Trans–Alaska Pipeline Liability Fund (the "Fund").

The Fund was established in 1973 by the Trans–Alaska Pipeline Authorization Act (the "Act"). Pub.L. No. 93–153, 87 Stat. 576 (1973) (codified at 43 U.S.C. §§ 1651–54). Section 1653(c) of the Act creates strict liability for damages caused by marine spills of Alaska crude oil transported through the Trans–Alaska pipeline and loaded onto vessels at the pipeline terminal. 43 U.S.C. § 1653(c). To provide moneys for the payment of compensation out of the Fund, the Act imposes a tax on oil moving through the pipeline. See In re Glacier Bay, 944 F.2d 577, 580–81 (9th Cir.1991).

The four claims that are the subject of this appeal are said to be representative of many others whose denial by the Fund was affirmed by the district court in the order appealed from. The claims are as follows:

1. Honorable William W Schwarzer, Senior District Judge for the Northern District of California, sitting by designation.

Kodiak Electric Cooperative, an electric utility, claims to have lost its largest customers when seafood processing companies closed or operated at low levels because of the shortage of fish for processing;

Killer Whale Cafe, a restaurant, claims to have lost much of its patronage when the oil spill idled commercial fishermen for a season;

Michael T. Tuhy d/b/a 2 E Fish Company and Alaska Sport Angling Photography (ASAP), two tourist-oriented businesses, claim cancellations and loss of customers due to cancellation of a part of the fishing season; and

Marine Welding, Inc., a boat repair company, claims a decline of business because of the decrease in fishing operations after the spill.

## PROCEDURAL BACKGROUND

In September 1990, early in the massive litigation that resulted from the oil spill, the district court determined that the Fund should be utilized to provide expedited payments to the many persons and firms who suffered losses. The court urged plaintiffs in the pending actions to promptly file claims with the Fund for administrative resolution. The court later ruled that the Fund process would not be treated as exclusive and that exhaustion of Fund remedies would not be required before others could be pursued.

Beginning in 1990, plaintiffs in the oil spill litigation began to submit claims to the Fund. In 1991, the Fund's board of trustees appointed John J. Gibbons, who had recently retired as chief judge of the Third Circuit Court of Appeals, to serve as administrator to review and decide the claims submitted to the Fund, which ultimately numbered 29,000. See 29 C.F.R. § 29.3(c) (1992).

The claims process established by the Fund required a claimant to file a simple registration form setting out the claimant's name and the nature and amount of the claim. The Fund would then request the claimant to furnish documents and information supporting the claim. This response was initially to be made within 30 days, but the Fund extended the deadline several times, eventually giving all claimants until September 1991, more than 28 months from the date of the spill in March 1989. Some claimants were given until December 1991.

Beginning in December 1991, the Fund issued preliminary determinations of claims. Claimants were permitted to make requests for reconsideration within 30 days. While the Fund gave extensions of time where justified, it accepted no new documents in support of reconsideration. A claimant was then entitled to appeal the Fund's determination to the district court. Various claimants whose claims had been denied took appeals, challenging the claims process as violative of due process.

These claimants also challenged the district court's affirmance of the Fund's determination that their losses were not proximately caused by the oil spill. The Fund, following the district court's direction in a prior order to determine proximate cause on a case-by-case basis and to consider remoteness in time, place, and like factors, determined the claimants' damages to be too remote.

The district court upheld both the validity of the Fund's claims procedure and the propriety of its proximate cause ruling, and entered a final order disposing of the claimants' appeals. The representative claimants appeal from that determination. We have jurisdiction under 28 U.S.C. § 1291, and now affirm.

## DENIAL OF DUE PROCESS

Appellants state in their brief that "[t]he only Fund procedure at issue in this appeal is one which required claimants to submit information to the Fund within thirty days." They complain that the Fund "would not, and generally did not accept information after that deadline," and they argue that "such expedited procedures violated due process."

In their argument to this court, claimants ignore the fact that they had over two years to submit proof in support of their claims. Their argument is directed solely at the Fund's rule limiting the time to file requests for reconsideration to 30 days and barring submission of new documents with such requests.

While we review due process challenges *de novo, National Assn. of Radiation Survivors v. Derwinski,* 994 F.2d 583, 587 (9th Cir.), *cert. denied,* 510 U.S. 1023, 114 S.Ct. 634, 126 L.Ed.2d 592 (1993), absent constitutional constraints or extremely compelling circumstances, we defer to an administrative agency's fashioning of procedures. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 543–44, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978). The Fund is authorized to "establish uniform procedures and standards for the appraisal and settlement of claims." 43 C.F.R. § 29.9(d)(2). The Act itself requires the Fund to "expeditiously pay claims...." 43 U.S.C. § 1653(c)(3). With some 29,000 claims pending, we cannot say that the procedure and deadlines adopted by the Fund for reconsideration of preliminary determinations were unreasonable. There is no merit in claimants' arguments analogizing this procedure to imposition of discovery sanctions and to denial of an opportunity to be heard before termination of benefits.

## PROXIMATE CAUSE

Under the Act, the Fund is "strictly liable without regard to fault ... for all damages ... sustained by any person or entity ... *as the result of discharge of oil* from [a vessel loaded with oil transported through the pipeline and loaded at the pipeline terminal facilities]." 43 U.S.C. § 1653(c)(1) (emphasis added). In applying this provision, the Fund relied on the district court's earlier order in which it had instructed the Fund that

> [i]n assessing causation, the Fund may consider remoteness of whatever dimension. Time, place, and like factors are all proper considerations, leading to a decision that economic damages were or were not the result of the *Exxon Valdez* oil spill.

Claimants do not challenge the district court's earlier order. The Fund also relied on this court's decision in *Benefiel v. Exxon Corp.,* 959 F.2d 805 (9th Cir.1992), holding that recovery under the Act is properly denied for damage not caused directly by the oil spill but flowing from a series of intervening events triggered by the spill.

The determinations complained of fall into two groups. One comprises claims of businesses who suffered losses because the impact of the oil spill on their customers caused patronage to decline. Thus, Kodiak Electric Cooperative lost business because its largest customers, seafood processing companies, agreed to reduce the amount of fish processed; the Killer Whale Cafe had to close because of a decline of business; tourist businesses suffered losses from cancellations of bookings. Those claims were denied as too remote because of the presence of intervening causes, such as diversion of labor to clean-up activities, the independent decisions of prospective customers, or a general decline of business due to the disruption of fishing. Another group comprises claims deemed geographically remote; both Marine Welding and ASAP were located outside of the geographic limits of the oil spill.

Because the Fund's determinations of whether damage was "the result of discharge of oil" are predominantly factual, judicial review is deferential. *See Weyerhaeuser Co. v. Atropos Island,* 777 F.2d 1344, 1351 (9th Cir.1985) (proximate cause finding may be reversed only if clearly erroneous); *Benefiel v. Exxon Corp.,* 959 F.2d 805, 808 (9th Cir.1992); *cf. United States v. McConney,* 728 F.2d 1195, 1202 (9th Cir.1984) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). The Fund's determinations were consistent with our interpretation of the Act's purpose in *Benefiel* that "Congress envisioned damages arising out of the physical effects of oil discharges ... [not] remote and derivative damages ... outside the zone of dangers against which Congress intended to protect when it passed [the Act]." 959 F.2d at 807. It was incumbent on the Fund to draw a line at some point along the chain of causation dividing the claims it would entertain from those that were too remote. Because they were not lacking a factual basis and have not been shown to be clearly erroneous, the district court was correct when it affirmed the Fund's determinations.

AFFIRMED.