270 F.3d 1215 (9th Cir. 2001)
 IN RE: THE EXXON VALDEZ,
GRANT BAKER, ET AL., AS REPRESENTATIVES OF THE MANDATORY PUNITIVE DAMAGES CLASS, PLAINTIFFS-APPELLEES
v.
JOSEPH HAZELWOOD, DEFENDANT,
AND
EXXON CORPORATION; EXXON SHIPPING COMPANY, DEFENDANTS-APPELLANTS
IN RE: THE EXXON VALDEZ,
GRANT BAKER, ET AL., AS REPRESENTATIVES OF THE MANDATORY PUNITIVE DAMAGES CLASS, PLAINTIFFS-APPELLEES,
v.
EXXON CORPORATION; EXXON SHIPPING COMPANY, DEFENDANTS,
AND
JOSEPH HAZELWOOD, DEFENDANT-APPELLANT
DANIEL R. CALHOUN; BRADFORD J. CHISHOLM; DAVID P. CLARKE; THOMAS S. MCALLISTER; PHILLIP G. MCCRUDDEN; MICHAEL J. MCCLENAGHAN; GUY PIERCEY; HUGH WISNER; GRANT C. BAKER; LARRY L. DOOLEY; KIM J. EWERS; JOHN W. HERSCHLEB; KENT HERSCHLEB; DAVID B. HORNE; MICHAEL J. OWECKE; GERALD E. THORNE; GEORGE A. GORDAOFF; OLD HARBOR NATIVE CORPORATION; TIMBERLINE, INC.; BARBARA BROWN; JOHN FOGES; JAMIE L. HALLADAY; CHARLES MCMAHON; JENNIFER BRIGGS; TERRI MAST; MARK T. COLES; FRED GALICANO; MIKE HOLLERBEKE; KATHY BRYAN; VINCENT LIBED; ART HUDDLESTON; OPINION ROBERT LOVE; ROXANE VILLAUEVA; MARCELO ROMBAOA; SCOTT HULBERT; BRIAN GILLIS; FRANK MICHAEL CARLSON; ELENOR MCMULLEN; NATIVE VILLAGE OF LARSEN BAY; NATIVE VILLAGE OF CHENEGA BAY, PLAINTIFFS-APPELLANTS
v.
EXXON CORPORATION; EXXON SHIPPING COMPANY; JOSEPH HAZELWOOD, DEFENDANTS-APPELLEES
 Nos. 97-35191, to 97-35193 and 97-35235.
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted May 3, 1999
Filed November 7, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 John F. Daum, O'Melveny & Myers, LLP, Los Angeles, California, for appellant Exxon Corporation.
 David M. Heilbron (briefed), McCutchen, Doyle, Brown & Enersen, LLP, San Francisco, California, for appellant Exxon Shipping Company.
 Thomas M. Russo (briefed), Chalos & Brown, P.C., New York, New York, for appellant Joseph Hazelwood.
 David C. Tarshes (briefed), Davis, Wright, Tremaine, LLP, Anchorage, Alaska, for the appellees.
 Brian B. O'Neill (argued), Faegre & Benson, Minneapolis, Minnesota, for the appellees.
 Appeal from the United States District Court for the District of Alaska; H. Russell Holland, District Judge, Presiding. D.C. No. CV-89-00085-HRH; CV-89-00095-HRH
 Before: Schroeder,* Chief Judge, Browning and Kleinfeld, Circuit Judges.
 Kleinfeld, Circuit Judge:
 
 
 1
 This is an appeal of a $5 billion punitive damages award arising out of the Exxon Valdez oil spill. This is not a case about befouling the environment. This is a case about commercial fishing. The jury was specifically instructed that it could not award damages for environmental harm. The reason is that under a stipulation with the United States and Alaska, Exxon had already been punished for environmental harm.[1] The verdict in this case was for damage to economic expectations for commercial fishermen.
 
 
 2
 The plaintiffs here were almost entirely compensated for their damages years ago. The punitive damages at issue were awarded to punish Exxon,[2] not to pay back the plaintiffs. Among the issues are whether punitive damages should have been barred as a matter of law and whether the award was excessive. The law began changing shortly after judgment, and important aspects of this opinion are controlled by a Supreme Court decision that came down only last term, Cooper Industries, Inc. v. Leatherman Tool Group, Inc.[3]
 
 Facts
 
 3
 Bligh Island and Bligh Reef have been known to navigators for a long time. Captain George Vancouver charted and named the island on his third voyage to the North Pacific on the Discovery in 1794.[4] The Bligh Island Reef has long been mapped on U.S. Coast and Geodetic Survey maps, shortened to Bligh Reef by the Coast and Geodetic Survey in 1930.[5] Captain William Bligh and Vancouver had been officers together sixteen years earlier, on the Resolution, when Captain James Cook, among the greatest navigators in history, explored Alaska and the South Pacific.[6]
 
 
 4
 Captain William Bligh is infamous from Fletcher Christian's mutiny on the Bounty.[7] The infamy was refreshed in 1989, the 200th anniversary of the mutiny on the Bounty, by Captain Joseph Hazelwood of the Exxon Valdez.
 
 
 5
 On March 24, 1989, the oil tanker Exxon Valdez ran aground on Bligh Reef in Prince William Sound, Alaska. It has never been altogether clear why the Exxon Valdez ran aground on this long known, well-marked reef. Because we are reviewing a case that resulted in a jury verdict, we interpret the evidence, and state our account, most favorably to the parties successful at trial.[8]
 
 
 6
 The vessel left the port of Valdez at night. In March, it is still dark at night in Valdez, the white nights of the summer solstice being three months away. There is an established sea lane that takes vessels well to the west of Bligh Reef, but Captain Hazelwood prudently took the vessel east of the shipping lanes to avoid a heavy concentration of ice in the shipping lane, which is a serious hazard. Plaintiffs have not claimed that Captain Hazelwood violated any law or regulation by traveling outside the sea lane. The problem with being outside the sea lane was that the ship's course was directly toward Bligh Reef.
 
 
 7
 Bligh Reef was not hard to avoid. All that needed to be done was to bear west about the time the ship got abeam of the navigation light at Busby Island, which is visible even at night, some distance north of the reef. The real puzzle of this case was how the ship managed to run aground on this known and foreseen hazard.
 
 
 8
 There was less than a mile between the ice in the water, visible at night only on radar, and the reef. Captain Michael Clark, an expert witness for the plaintiffs, testified that an oil tanker is hard to turn, more like a car on glare ice than a car on asphalt:
 
 
 9
 Q: Let's talk a minute about how you turn one of these vessels. Now, this we're talking about a vessel here that's in excess of 900 feet long, all right? Over three football fields.
 
 
 10
 What's it like to turn one of these?
 
 
 11
 A: Well, it's not like turning a car or a fishing boat or something. There is a -as you are traveling in one direction and you put the rudder over, even though the head of the vessel will turn, your actual direction of travel keeps going in the old direction. Sort of like you're steering a car on ice; you turn the wheel and you just keep going in the same direction. Eventually you'll start to turn and move in the direction you're headed for.
 
 
 12
 Q: Okay. Is it just as easy as turning a car?
 
 
 13
 A: No.
 
 
 14
 Q: And does it make any sense to try to compare changing course in one of these vessels fully laden to that of turning a corner with a car?
 
 
 15
 A: No.
 
 
 16
 Q: To make it turn on a vessel, there has to be a rudder command given?
 
 
 17
 A: Yes.
 
 
 18
 Q: And once you give that rudder command, is that the end of the turn?
 
 
 19
 A: No. No, you have to watch and make sure that the rudder command is made as you ordered it and to make sure that it's having the desired effect.
 
 
 20
 Q: Is there anything else that has to be done in order to put it on the course that you want it on?
 
 
 21
 A: Yes, you usually have to give counter rudder to slow the turn down.[9]
 
 
 22
 Considering the ice in the water, the darkness, the importance of turning the vessel away from Bligh Reef before hitting it, and the tricky nature of turning this behemoth, one would expect an experienced captain of the ship to manage this critical turn.
 
 
 23
 But Captain Hazelwood left the bridge. He went downstairs to his cabin, he said, to do some paperwork. A special license is needed to navigate the oil tanker in this part of Prince William Sound, and Captain Hazelwood was the only person on board with the license. There was testimony that captains simply do not leave the bridge during maneuvers such as this one and that there is no good reason for the captain to go to his cabin to do paperwork at such a time. Captain Hazelwood left the bridge just two minutes before the turn needed to be commenced, which makes it all the more strange that he left at all.
 
 
 24
 Before leaving, Captain Hazelwood added to the complexity of the maneuver that needed to be made: he put the vessel on autopilot, which is not usually done when a vessel is out of the shipping lanes, and the autopilot program sped the vessel up, making it approach the reef faster and reducing the time during which error could be corrected. As Captain Hazelwood left, he told Cousins, the third mate, to turn back into the shipping lane once the ship was abeam of Busby Light. Though this sounds plain enough, expert witnesses testified that it was a great deal less clear and precise than it sounds.
 
 
 25
 Captain Hazelwood's departure from the bridge, though unusual, was not inexplicable. The explanation put before the jury was that his judgment was impaired by alcohol. He was an alcoholic. He had been treated medically, in a 28 day residential program, but had dropped out of the rehabilitation program and fallen off the wagon. He had joined Alcoholics Anonymous, but had quit going to meetings and resumed drinking. Testimony established that prior to boarding his ship, he drank at least five doubles (about fifteen ounces of 80 proof alcohol) in waterfront bars in Valdez. The jury could have concluded from the evidence before them that leaving the bridge was an extraordinary lapse of judgment caused by Captain Hazelwood's intoxication. There was also testimony that the highest executives in Exxon Shipping knew Hazelwood had an alcohol problem, knew he had been treated for it, and knew that he had fallen off the wagon and was drinking on board their ships and in waterfront bars.
 
 
 26
 There are supposed to be two officers on the bridge, but after Hazelwood left, there was only one. The bridge was left to the fatigued third mate, Gregory Cousins, a man in the habit of drinking sixteen cups of coffee per day to keep awake. Cousins was not supposed to be on watch-his watch was ending and he was supposed to be able to go to sleep--but his relief had not shown up, and Cousins felt that it was his responsibility not to abandon the bridge. He was assisted only by the helmsman, Robert Kagan. Kagan, meanwhile, had forgotten his jacket, ran back to his cabin for it, and returned to the bridge a couple of minutes before the time the turn had to be initiated. Cousins and Kagan thought they had conducted the maneuver, but evidently they had not. When Cousins realized that the vessel was not turning, he directed an emergency maneuver that did not work.
 
 
 27
 Shortly after midnight on March 24, 1989, the tanker ran onto Bligh Reef. The reef tore the hull open. Prince William Sound was polluted with eleven million gallons of oil.
 
 
 28
 Exxon spent over $2 billion on efforts to remove the oil from the water and from the adjacent shores, and even from the individual birds and other wildlife dirtied by the oil. It also began an extensive program of settling with property owners, fishermen and others, whose economic interests were harmed by the spill. Some were paid cash without providing releases, some released some claims but not all, and some released all claims. Exxon spent $300 million on voluntary settlements prior to any judgments being entered against it.
 
 
 29
 The State of Alaska and the United States brought actions against Exxon for the injury to the environment. Those cases were resolved by entry of a consent decree on October 8, 1991, under the terms of which Exxon agreed to pay at least $900 million to restore damaged natural resources.[10] Hundreds of private civil actions were filed in federal and state court.[11] Numerous issues have been resolved on appeal regarding various aspects of the complex litigation arising out of the disaster.[12]
 
 
 30
 This case involves the action for compensatory and punitive damages by entities affected by the spill. The District Court certified a Commercial Fishing Class, a Native Class, and a Landowner Class for compensatory damages. The district court also certified a mandatory punitive damages class, so the award would not be duplicated in other litigation and would include all punitive damages the jury thought appropriate. For purposes of this litigation, Exxon stipulated that its negligence caused the oil spill. The district court, which did a masterful job of managing this very complex case, tried the case to the jury in three phases. In the first phase, the jury found that Hazelwood and Exxon had been reckless, in order to determine liability for punitive damages. The second phase assessed the amount of compensatory damages attributable to the spill to commercial fishermen and Alaska Natives. The third phase established the amount of punitive damages. A fourth phase, which settled before trial, was to determine the compensatory damages of plaintiffs whose damages were not determined in Phase II, including landowners and participants in other commercial fisheries.
 
 
 31
 The jury awarded $287 million in compensatory damages, from which the court deducted released claims, settlements, and payments by the Trans-Alaska Pipeline Liability Fund to find net compensatory damages of $19,590,257. The jury also awarded, in what was then the largest punitive damages award in American history, $5 billion in punitive damages against Exxon, as well as $5,000 in punitive damages against Hazelwood.
 
 
 32
 After extensive post-trial motion litigation, the district court entered judgment for the plaintiffs against Hazelwood and Exxon. Exxon and Hazelwood timely appealed. Plaintiffs cross appealed.
 
 Analysis
 
 33
 To assure that we respond to all the points raised in the very lengthy briefs, we treat the issues in the order that the appellants and cross appellants raise them.
 
 
 34
 I. Punitive Damages Permissibility.
 
 
 35
 Exxon argues that punitive damages ought to have been barred as a matter of law because as a matter of policy they are inappropriate in the circumstances, and because other principles of law bar them.
 
 
 36
 A. Policy.
 
 
 37
 Exxon argues that as a matter of due process, no punitive damages can be awarded in this case because the criminal and civil sanctions, cleanup expenses and other consequences of the spill have already so thoroughly punished and deterred any similar conduct in the future that no public purpose is served by the award. Exxon was sanctioned with a fine and restitution award of $125 million for environmental crimes. The prosecutors and the district court, in approving the plea agreement and sentence, emphasized its sufficiency. Exxon also spent $2.1 billion cleaning up the spill, a massive deterrent to repeating the conduct that led to it. The expenses associated with the spill hurt Exxon's profits, even though the punitive damages award has not yet been paid pending resolution of this appeal.
 
 
 38
 As plaintiffs correctly point out, a prior criminal sanction does not generally, as a matter of law, bar punitive damages.[13] Exxon's argument has some force as logic and policy. But it has no force, in the absence of precedent, to establish that the law, or the Constitution, bars punitive damages in these circumstances. Because we have not been made aware of a principle of law pursuant to which we should strike a punitive damages award on the ground that the conduct had already been sufficiently punished and deterred, we reject the argument.
 
 
 39
 B. Punitive Damages in Maritime Law.
 
 
 40
 Exxon argues that punitive damages are not traditionally allowable in admiralty law. The argument is mistaken. Sometimes punitive damages are allowable, sometimes they are not.[14]
 
 
 41
 Exxon also argues that our decision in Glynn v. Roy Al Boat Management Corp. requires reversal of the punitive damages award.[15] That case is plainly distinguishable and carries no such implication. Glynn was not a maritime tort case such as the one at bar. Glynn was about maintenance and cure, which "is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery."[16] We held there that punitive damages were unavailable in maintenance and cure cases, for three reasons: (1) under Vaughan v. Atkinson,[17] attorneys' fees were available to deter the same kind of misconduct for which punitive damages may be used; (2) maintenance and cure is "pseudocontractual" and punitive damages are traditionally unavailable for breach of contract; and (3) under Miles v. Apex Marine Corp.,[18] we were not free to expand seamen's remedies at will.[19] Glynn concerns an entirely different cause of action and none of the reasons for the Glynn rule apply here. It would thus be inappropriate for us to apply the Glynn rule to a general maritime tort case such as this one.
 
 
 42
 C. Res Judicata.
 
 
 43
 Exxon argues that the punitive damages award must be vacated as a matter of law because it is barred by res judicata. The State of Alaska and the United States sued Exxon and related defendants under a provision of the Clean Water Act. The Act, as it stood at the time of the spill,[20] entitled federal and state representatives to "act on behalf of the public as trustee of the natural resources to recover for the costs of replacing or restoring such resources,"[21] as well as establishing civil penalties.[22] Claims were allowed against the owner or operator of a vessel from which oil was illegally discharged.[23] Recovery of penalties and costs was limited to a monetary ceiling unless the spill resulted from "willful negligence or willful misconduct," in which case the ceiling on costs was removed and the owner or operator may be liable "for the full amount."[24]
 
 
 44
 The consent decree pursuant to which the case was settled states that the $900 million settlement is "compensatory and remedial," and none of the amounts are described as punitive. Though the government signatories released all government claims, the consent decree provides explicitly that "nothing in this agreement, however, is intended to affect legally the claims, if any, of any person or entity not a Party to this Agreement."
 
 
 45
 Exxon's argument is essentially that the governments released plaintiffs' private claims, even though plaintiffs did not consent to any such release, because the governments were acting as parens patriae for the private claimants, and because punitive damages plaintiffs act as "private attorneys general," a prohibited exercise when the actual public attorneys general have already discharged the claims.
 
 
 46
 The authority on which Exxon relies, Alaska Sport Fishing Ass'n v. Exxon Corp., though, is distinguishable.[25] The sport fishermen there did not claim any damages to any property they owned or economic interests, just to the ferae naturae, the natural resource of fish in the wild.[26] The sport fishermen's claims made were on behalf of the general public as to the lost use of unowned natural resources, and we held that the state acted as parens patriae to protect its sovereign interest in these natural resources, so the plaintiffs were in privity with the state and were barred by the consent decree.[27]
 
 
 47
 By contrast, here the plaintiffs sued to vindicate harm to their private land and their ability to fish commercially and fish for subsistence. The consent decree was expressly not "intended to affect legally the claims, if any, of any person or entity not a Party to this Agreement." The consent decree did not affect claims regarding private land. It also did not affect the individual claims of commercial and subsistence fishermen involving lost income and lower harvests, which are distinguishable from the rights of recreational fishermen. Commercial and subsistence fishermen are "favorites of admiralty" and their rights are frequently given special protection.[28] The Tenth Circuit has similarly decided such an issue.[29]
 
 
 48
 As for the "private attorneys general" metaphor, it is just that, a metaphor, and "[m]etaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it."[30] The metaphor is faulty here. The consent decree in the case at bar explicitly covered payments that are "compensatory and remedial in nature," not punitive, so there can be no serious claim that the actual attorneys general already obtained the punishment that the plaintiffs obtained in the case at bar.
 
 
 49
 The parties must have intended to preserve private claims by their language expressly excluding them from the settlement. The Alaska Sport Fishing case does compel the conclusion that Exxon cannot be punished in this case for harming the environment and the general public. That is why we mentioned at the outset that this is not a case about befouling the environment. The punitive damages in this case are for harming the economic interests of commercial fishermen, the availability of fish to native subsistence fishermen, and private land. As such, the harm and the punishment is distinct from the harm to the environment and natural resources that we held in Alaska Sport Fishing had already been vindicated.
 
 
 50
 D. Statutory preemption of common law.
 
 
 51
 Exxon argues that the common law punitive damages remedy has been preempted by the comprehensive scheme for oil spill remedies in the Clean Water Act. Plaintiffs argue that Exxon waived this argument, and that even if Exxon did not waive it, far from preempting additional remedies, the statutory scheme expressly preserves them.
 
 
 52
 First, we consider waiver. Plaintiffs correctly point out that before the case went to trial on punitive damages, Exxon's statutory preemption argument focused only on the Trans-Alaska Pipeline Authorization Act,[31] not the Clean Water Act.[32] Exxon does not maintain on appeal its argument based on the Trans-Alaska Pipeline Authorization Act, so we do not consider that Act.
 
 
 53
 After the $5 billion verdict came back in the punitive damages case on October 23, 1995, Exxon tendered for filing a motion for judgment on punitive damages, along with a motion to lift a stay then in effect. Exxon argued that the verdict should be vacated as a matter of law, because common law punitive damages were preempted both by the Trans-Alaska Pipeline Authorization Act and by the Clean Water Act. Plaintiffs erroneously argued that the stay should not be lifted on the ground that the motion argued nothing new and merely reiterated the punitive damages argument previously ruled upon. The district court denied the motion to lift the stay and to file the motion.
 
 
 54
 We conclude that the issue should not be treated as waived. Exxon clearly and consistently argued statutory preemption as one of its theories for why punitive damages were barred as a matter of law, and argued based on the Clean Water Act prior to entry of judgment. Because the issue is massive in its significance to the parties and is purely one of law, which requires no further development in district court, it would be inappropriate to treat it as waived in the ambiguous circumstances of this case.[33]
 
 
 55
 Exxon further argues that because the Clean Water Act does not provide for punitive damages and does provide a comprehensive remedial scheme, punitive damages should be deemed preempted. Before and after the Exxon Valdez oil spill, the Clean Water Act's section on "Oil and hazardous substance liability" provided a carefully calibrated set of civil penalties for oil spills, generally with ceilings on penalties, even if the spills were grossly negligent or willful.[34]
 
 
 56
 Exxon's argument is that this carefully graduated and limited set of liabilities by implication precludes such unlimited and non-compensatory liability as the $5 billion punitive damages award in this case. In support of this inference, Exxon points to the Supreme Court decisions in Miles v. Apex Marine Corp.[35] and in Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,[36] as well as to two circuit court cases.
 
 
 57
 Miles does not offer substantial support for Exxon's argument. It holds that loss of society and loss of future income are not compensable in a seaman's wrongful death case.[37] The reasoning is based on the long and technical history of wrongful death actions, and the traditional restrictions of wrongful death remedies in Lord Campbell's Act.[38] True, the Congressional limitations were held to prevent an inference of broader remedies in the general maritime law, but the tort was the specialized and traditionally limited one of wrongful death.
 
 
 58
 Sea Clammers raises a serious question. In Sea Clammers, plaintiffs claimed that the EPA and Army Corps of Engineers had permitted discharge of sewage into New York Harbor and the Hudson beyond what the statutes allowed, and that the permittees had violated their permits.[39] The Court held that the Clean Water Act and the Marine Protection, Research, and Sanctuaries Act provided a carefully structured set of citizens' remedies,[40] but not the private action for monetary and injunctive relief sought in the case, so Congress must not have meant to provide for this additional remedy.[41] A common law nuisance remedy was precluded.[42]
 
 
 59
 Though the question is not without doubt, we conclude that the better reading of the Clean Water Act is that it does not preclude a private remedy for punitive damages. The Clean Water Act section on oil and hazardous substance liability states:
 
 
 60
 Nothing in this section shall affect or modify in any way the obligations of any owner or operator of any vessel, or of any owner or operator of any onshore facility or offshore facility to any person or agency under any provision of law for damages to any publicly owned or privately owned property resulting from a discharge of any oil or hazardous substance or from the removal of any such oil or hazardous substance.[43]
 
 
 61
 In section 1365, the Clean Water Act expressly provides that it does not preempt common law rights to other relief:
 
 
 62
 Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief . . . .[44]
 
 
 63
 The section 1365 savings clause was held in Sea Clammers not to preserve the claims plaintiffs made, but there the claims were for violations of the Act in which the savings clause was found, and the Court explained that "[i]t is doubtful that the phrase `any statute' includes the very statute in which this statement was contained."[45] By contrast, the action in the case at bar is entirely at common law and not for violation of the statute in which the savings clause is found.
 
 
 64
 The nuisance action, more analogous to the claims in the case at bar, was also held in Sea Clammers to be preempted by the Clean Water Act, following Milwaukee v. Illinois.[46] Milwaukee held that a federal district court could not impose and enforce more stringent effluent limitations than those established by the administrative agency charged with enforcement of the Clean Water Act, so for purposes of a claim seeking that relief, the Clean Water Act preempted the common law remedy.[47] That is, the administrative agency decided to subordinate to some degree the interest in protecting shellfish and bottomfish to the interest in allowing a city to dispose of its sewage, and the district court was not allowed to change that balance and allow bottomfish protection to trump safe disposal of sewage. In the case at bar, Exxon does not argue that the plaintiffs seek any remedies that might conflict with the decision of an administrative agency charged with enforcement responsibility.
 
 
 65
 The issue is close, particularly because the Clean Water Act effective at the time of the Exxon Valdez spill provides for civil penalties for oil spills and limits them to $50,000, or "where the United States can show that such discharge was the result of willful discharge or willful misconduct," $250,000.[48] One reading of this limit is that Congress decided that the most a willful oil polluter should be liable for is $250,000. But that is not the only sensible reading. This penalty is for damage to public resources, enforceable by the United States, and the monetary limit does not necessarily conflict with greater punitive amounts for private interests harmed. After all, if the government could take all the money a defendant had, the private plaintiffs would be left out in the cold with uncollectable judgments.
 
 
 66
 Where a private remedy does not interfere with administrative judgments (as it would have in Milwaukee) and does not conflict with the statutory scheme (as it would have in Sea Clammers), a statute providing a comprehensive scheme of public remedies need not be read to preempt a pre-existing common law private remedy. It is reasonable to infer that had Congress meant to limit the remedies for private damage to private interests, it would have said so. The absence of any private right of action in the Act for damage from oil pollution may more reasonably be construed as leaving private claims alone than as implicitly destroying them.
 
 
 67
 Exxon also cites First and Second Circuit decisions, Conner v. Aerovox[49] and In re Oswego Barge Corp.,[50] for the proposition that the Clean Water Act preempts common law remedies such as those upon which the plaintiffs relied. Both cases are distinguishable.
 
 
 68
 Conner holds that fishermen cannot recover for pollution on a nuisance theory, under Sea Clammers and Milwaukee.[51] Exxon does not argue that the plaintiffs' recovery in the case at bar is on a common law nuisance theory. The reason this distinction makes a difference is that, as the Supreme Court explained in Milwaukee, a nuisance theory would enable a federal district judge to substitute a different balancing of interests from the one made by the agency to which Congress assigned the job in the NPDES permit system.[52]
 
 
 69
 Oswego Barge is distinguishable for a different reason. There the common law remedies sought were by the government, not by private parties.[53] The government itself wanted a broader range of remedies and more damages than were permitted by the Clean Water Act.[54] The Second Circuit read the Clean Water Act as we do, and concluded that its remedies section "preempted the Government's non-FWCPA remedies against a discharging vessel for cleanup costs."[55] It does not speak at all to private remedies for private harms, just to whether the government can seek remedies unfettered by the limitations on the government's own remedies promulgated in the Clean Water Act.[56]
 
 
 70
 We conclude that the Clean Water Act does not preempt a private right of action for punitive as well as compensatory damages for damage to private rights. Again, what saves plaintiff's case from preemption is that the $5 billion award vindicates only private economic and quasi-economic interests, not the public interest in punishing harm to the environment.
 
 
 71
 II. Jury Instructions.
 
 
 72
 A. Standard of Proof.
 
 
 73
 Exxon requested that the judge instruct the jury that to find malicious or reckless action, it must be satisfied "that plaintiffs have shown by clear and convincing evidence that the spill was the proximate result of malicious or reckless conduct and that the Exxon defendants are legally responsible for that conduct." The judge declined to instruct on a "clear and convincing" standard. The jury was instructed that the plaintiffs had the burden of proving "by a preponderance of evidence" that the conduct manifested reckless or callous disregard for the rights of others, and was a legal cause of the grounding of the Exxon Valdez.
 
 
 74
 Exxon argues for a clear and convincing standard on various policy grounds, such as that it would be more consistent with the traditional purpose of admiralty law of limiting liability, and the greater harm caused by an erroneous award than erroneous denial of an award because punitive damages are a windfall rather than compensation to plaintiffs.
 
 
 75
 The standard of proof generally applied in federal civil cases is preponderance of evidence.[57] Congress has in special instances, such as habeas corpus and deportation, required proof by clear and convincing evidence,[58] but it has not so legislated for maritime cases.
 
 
 76
 The Supreme Court has noted that "clear and convincing" standards in state law are "an important check against unwarranted imposition of punitive damages."[59] But when specifically faced with the question whether a preponderance of evidence standard denied due process of law to defendants, it held that the looser standard was permissible.[60] In Haslip, the Court stated in dictum that "[t]here is much to be said in favor of a State's requiring" a higher standard of proof, but held that Alabama's much lower standard, that the jury be "reasonably satisfied from the evidence," was constitutionally permissible.[61]
 
 
 77
 While the common law of admiralty could require a higher standard of proof for punitive damages than the Constitution requires, we have been presented with no authority for creating an exception to the general federal standard, and the arguments for doing so are not so compelling as to persuade us, in the absence of precedent, that the district court abused its discretion by instructing on the preponderance of evidence standard.
 
 
 78
 B. Vicarious Liability.
 
 
 79
 Exxon argues that the district court erroneously instructed the jury that it could impose punitive damages on Exxon even if all the recklessness was by its employee Captain Hazelwood rather than by Exxon itself. The district court instructed the jury twice on vicarious liability.
 
 
 80
 Phase I of the trial established that Exxon was "reckless" and that its recklessness was "a legal cause of the grounding of the Exxon Valdez." Had the jury not so found, the district court would not have allowed the jury to return a punitive damages verdict against Exxon.
 
 
 81
 Exxon argues that the Phase I instructions 33, 34 and 36 were incorrect. Instruction 33 said that a "corporation is not responsible for the reckless acts of all of its employees," but is for "those employees who are employed in a managerial capacity while acting in the scope of their employment." Instruction 34 defined a "managerial capacity " employee as one who "supervises other employees and has responsibility for, and authority over, a particular aspect of the corporation's business." Instruction 36 said that acts contrary to the corporation's policies "are not attributable to the employer" provided that "adequate measures were taken to establish and enforce the policies or directions," but that"[m]erely stating or publishing instructions or policies without taking diligent measures to enforce them is not enough to excuse the employer for reckless actions of the employee that are contrary to the employer's policy or instructions."
 
 
 82
 Phase III of the trial set the amount of punitive damages. The jury had a second chance in Phase III to deny punitive damages altogether despite its prior verdict that Exxon was reckless. Exxon does not directly challenge any of the Phase III instructions, but argues that they failed to correct the claimed error in the Phase I instructions, which allowed vicarious liability for punitive damages. The court stated in Phase III instruction 30 that if "corporate policy makers did not actually participate in or ratify the wrongful conduct," or if it "was contrary to company policies," then the jury "may consider" these facts "in mitigation or reduction of any award of punitive damages."
 
 
 83
 Exxon cites a line of authority beginning with a War of 1812 decision by Justice Story, The Amiable Nancy.[62] The Amiable Nancy was a neutral Haitian vessel carrying corn in the Carribean.[63] The Scourge was an American privateer commissioned to act as a private armed vessel in the war.[64] The captain of the Scourge sent his lieutenant and a crew merely to check the Amiable Nancy's papers, but, as midnight approached, the armed Americans boarded the Haitian vessel, and stole money, clothing, poultry, and other goods.[65] The Court held that "the honour of the country, and the duty of the court, equally require that a just compensation should be made to the unoffending neutrals."[66] And, the Court said, "if this were a suit against the original wrong-doers, " proper punishment by exemplary damages might be appropriate.[67] But the Court held that the owners of the privateer could not be held liable for "vindictive" (that is punitive) damages, because "[t]hey are innocent of the demerit of this transaction, having neither directed it, nor countenanced it, nor participated in it in the slightest degree."[68]
 
 
 84
 The Amiable Nancy, on its face, has no application to the case at bar. It is based in significant part on the fact that allowing punitive damages against privateers who engaged in improper conduct would defeat the government's War of 1812 policy to commission privateers.[69] But The Amiable Nancy rule has been interpreted more broadly in a number of decisions as a widely applicable shield against vicarious liability for punitive damages. In 1893, the Supreme Court held in Lake Shore & Michigan Southern Railway Co. v. Prentice that a national corporation could not be held liable for punitive damages because of the abusive conduct of a conductor toward a passenger.[70] It explained that The Amiable Nancy rule was a general common law rule prohibiting vicarious liability for punitive damages for an owner "innocent of the demerit of this transaction, having neither directed it, nor countenanced it, nor participated in it in the slightest degree."[71] Because there was no evidence that the corporation had any notice that the conductor was unsuitable in any way, or that the corporation "participated in, approved, or ratified" the conductor's misconduct, the judgment had to be reversed.[72]
 
 
 85
 Exxon is not in the position of the owners in The Amiable Nancy or Lake Shore of "having neither directed . . . nor countenanced . . . nor . . . participated in the slightest degree" in the wrong.[73] Here the jury found that the corporation, not just the employee, was reckless. The evidence established that Exxon gave command of an oil tanker to a man they knew was an alcoholic who had resumed drinking after treatment that required permanent abstinence, and had previously taken command in violation of Exxon's alcohol policies. Thus the liability is not that of an owner shielded by The Amiable Nancy "nor participated in the slightest degree " rule.[74]
 
 
 86
 In 1905, we addressed The Amiable Nancy in Pacific Packing & Navigation Co. v. Fielding.[75] During the Nome gold rush, the captain of a steamship bringing people back to Seattle at the end of the mining season imprisoned his purser, after the purser became deranged as they sailed through the Bering Sea.[76] We held that under The Amiable Nancy, the captain of a ship could not be treated as though he wielded"the whole executive power of the corporation" like a president, despite his sole command of the ship while at sea, so the owner of the vessel could not be vicariously liable for punitive damages merely and entirely on the basis of the captain's malice.[77]
 
 
 87
 We next considered this issue eighty years later in Protectus Alpha Navigation Co. v. North Pacific Grain Growers, Inc.[78] A grossly negligent dock foreman for North Pacific caused a fireman's death and Protectus Alpha's ship and cargo to be destroyed.[79] We expressed approval of the Restatement (Second) of Torts &#167 909 position, which stated that punitive damages can be awarded against a principal for an agent's torts, not only where they are authorized, ratified or approved and not only where the agent was unfit and the principal was reckless in employing him, but also where he was "employed in a managerial capacity and was acting in the scope of employment."[80] We affirmed a punitive damages judgment because the foreman was a managerial employee acting within the scope of his employment and had discretion in what he did.[81]
 
 
 88
 The district court in the case at bar instructed the jury precisely in accord with Protectus Alpha. To say that the court abused its discretion in so doing requires that we hold that Protectus Alpha is no longer the law.[82] That we cannot do. One of the amicus curiae urges that we do so, on the ground that Protectus Alpha was inconsistent with Pacific Packing.
 
 
 89
 We held en banc in United States v. Hardesty that if there is an irreconcilable conflict between two cases from this circuit, a panel's only choice is to call for rehearing en banc.[83] We do not conclude that the conflict between Pacific Packing and Protectus Alpha is "irreconcilable, " though the question is close.[84] One three judge panel may reconsider the decision of a prior panel only when "an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point."[85]
 
 
 90
 Subsequent to Protectus Alpha, the Supreme Court held in Pacific Mutual Life Insurance Co. v. Haslip that a punitive damages award against a corporation based purely on respondeat superior, with no wrongful conduct whatsoever on the part of the corporation, did not violate the corporation's due process rights.[86] The constitutional issue resolved there is not the same as the maritime law at issue here, but it is close. For one thing, Lake Shore held that The Amiable Nancy was common law, not just maritime law, so what goes for an insurance company in Haslip goes for an oil company in this case.[87] For another, the considerations bearing on the constitutional question in Haslip are hard to distinguish from the common law issues here. The only substantial distinction that is apparent is that if Congress disagrees with our resolution of the common law question, it can easily bring the law into accord with its view. Thus, Haslip lends further support to the conclusion reached in Protectus Alpha.
 
 
 91
 Exxon argues that even if Protectus Alpha is good law, it can be reconciled with The Amiable Nancy only by confining it to acts done on shore. The reckless dock foreman in Protectus Alpha acted on the dock, the reckless crew and subordinate officer in The Amiable Nancy on the sea. But Protectus Alpha did not explain its conclusion with reasoning supporting this distinction. We conclude that we are bound by Protectus Alpha.
 
 
 92
 III. Sufficiency of the Evidence.
 
 
 93
 A. Hazelwood.
 
 
 94
 Exxon argues that there was insufficient evidence for the jury to award punitive damages against Hazelwood or against itself for Hazelwood's conduct. Its theory is that the evidence, which it concedes established negligence, can establish no more. As Exxon portrays it, Hazelwood left the vessel in the hands of an experienced mate, with a clear instruction to turn right at the Busby Island light, and the mate unaccountably failed to carry out this simple instruction.
 
 
 95
 A jury could have interpreted the evidence as Exxon suggests, but it plainly did not. A far more damning account was well supported by testimony, exhibits, and reasonable inferences from them. The jury reasonably could have concluded that Hazelwood took command of the ship so drunk that a non-alcoholic would have passed out, made it harder to avoid the reef by taking the course east of the ice, made it harder to maneuver between the ice and the reef by putting the ship on an autopilot program that sped the vessel up, then left the ship in the hands of an overtired third mate just two minutes before the critical maneuver, barely enough time to calculate what to do and conduct the maneuver. Hazelwood's instructions were vague, and turning a supertanker right at the light is not like turning a car right at the light on dry pavement, more like turning right on glare ice. In so doing, Hazelwood violated numerous legal regulations as well as common sense in caring for his vessel.
 
 
 96
 We review a jury's verdict for substantial evidence, which "is such reasonable evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence."[88] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . [and] all justifiable inferences are to be drawn in [the prevailing party's] favor."[89] The jury reasonably could have concluded that Hazelwood knew he was being extremely careless and testified falsely about his knowledge, or that he did not realize how dangerous his acts were because he had impaired his own judgment by taking the bridge drunk.[90]
 
 
 97
 Exxon also argues that even operating a boat drunk and high on marijuana is not enough for punitive damages under our decision in Churchill v. F/V Fjord,[91] but that is not a correct reading of Churchill. Churchill held that despite the impaired condition of a youth operating a skiff, the district court's finding that the skiff's owner did not act willfully, recklessly, maliciously or with gross negligence was not clearly erroneous.[92] It is one thing to uphold a factual finding on appeal as we did in Churchill, quite another to set it aside, which Exxon requests here. A trial determination has a great deal of force, whichever way it goes.
 
 
 98
 B. Exxon.
 
 
 99
 Exxon argues that the evidence was insufficient to establish a predicate for punitive damages based on its own actions. It is true that if the jury granted punitive damages on the basis of the vicarious liability instructions discussed above, Exxon's own recklessness would not be essential to the outcome. But the instructions allowed the jury to award them based on Exxon's own conduct, so the jury may well have granted them based only on Exxon's own recklessness. We therefore consider whether there was sufficient evidence to establish it.
 
 
 100
 There was, as Exxon argues, an alternative interpretation the jury could have made of the evidence. It could have decided that Exxon followed a reasonable policy of fostering reporting and treatment by alcohol abusers, knew that Hazelwood had obtained treatment, did not know that he was an alcoholic, and did not know that he was taking command of his ship drunk. But of course, we review a jury's verdict for substantial evidence, not for whether the evidence could have supported a different verdict.[93]
 
 
 101
 There was substantial evidence to support the jury verdict. The jury could infer from the evidence that Exxon knew Hazelwood was an alcoholic, knew that he had failed to maintain his treatment regimen and had resumed drinking, knew that he was going on board to command its supertankers after drinking, yet let him continue to command the Exxon Valdez through the icy and treacherous waters of Prince William Sound.
 
 
 102
 Exxon had published policies that an employee with alcohol dependency would not be terminated for seeking rehabilitation. Its policies also provided that no crew member could attempt to perform any duties on one of its vessels within four hours of consuming any alcohol. Both sides attempt to make something of this. Plaintiffs stress that Exxon did not strictly enforce the four hour rule despite knowing that Hazelwood and others performed duties on its vessels within four hours of consuming alcohol, and Exxon contends it reasonably did not fire Hazelwood just because it knew he had an alcohol problem and participated in a rehabilitation program.
 
 
 103
 Both arguments are of little significance in the factual context of this case. Arguably knowing that a non-alcoholic had commanded a vessel three hours after consuming a few ounces of wine at dinner could not support punitive damages. As Exxon says, "if plaintiffs mean that sailors on shore leave occasionally visit bars, their discovery is as startling as Captain Renault's discovery that gambling was going on in Rick's Caf)." But knowing that an alcoholic has resumed drinking is far more serious. The jury could conclude from the evidence that Hazelwood's alcoholism required him to abstain totally, so that he could not have wine with dinner, let alone enough whiskey at waterfront bars to make most people unconscious. Arguably, it would have been improper and perhaps actionable to fire or transfer Hazelwood just for being an alcoholic who had sought treatment, but knowing that he had violated his treatment regimen by subsequently resuming drinking is far more serious, and he could have been fired, or at the very least transferred to less dangerous duty, for violating Exxon's policies.
 
 
 104
 The parties also dispute whether Exxon's tolerance of overtired employees who worked after exceeding the maximum permitted hours could support the verdict. Because of the evidence regarding Captain Hazelwood's drinking and Exxon's top executives' knowledge of it, we need not consider whether Cousin's fatigue and Exxon's knowledge of the routine use of fatigued crew could support the verdict.
 
 
 105
 IV. Amount of the Punitive Damages Award.
 
 
 106
 The jury awarded $5 billion in punitive damages against Exxon (as well as $5,000 in punitive damages against Captain Hazelwood). At the time, it was the largest punitive damages award in American history, so far as the litigants were able to determine. Exxon challenges the $5 billion award as excessive.
 
 
 107
 Ordinarily appellate courts must defer to juries.[94] If a reasonable mind could reach the result the jury reached on the evidence before them, that is ordinarily the end of it.[95] If there were no constitutional issue here, that might be the end of this discussion. This was a very bad oil spill. Captain Hazelwood's conduct, interpreting the evidence most strongly against him, was extremely reckless considering the difficulty and potential risk of his task, and Exxon was reckless to allow him to perform this task despite its knowledge that he was drinking again. The punitive damages amount, $5 billion, is about one year's net profits for the entire world-wide operations of Exxon, and the jury may well have decided that for such egregious conduct the company responsible ought to have a year without profit.
 
 
 108
 But a unique body of law governs punitive damages. In particular, under the Supreme Court's decision in Honda Motor Co. v. Oberg, a hands-off appellate deference to juries, typical of other kinds of cases and issues, is unconstitutional for punitive damages awards.[96] In Oberg, the Oregon Constitution prohibited judicial reduction of punitive damages awards "unless the court can affirmatively say that there is no evidence to support the verdict."[97] The Court held that the state constitutional denial of judicial review of the size of the award violated the due process clause of the Fourteenth Amendment.[98] Review limited to a "no substantial evidence" test "provides no assurance that those whose conduct is sanctionable by punitive damages are not subjected to punitive damages of arbitrary amounts."[99] The Court, explaining the importance of appellate review of punitive damages awards, noted that "more than half of those [punitive damages awards] appealed resulted in reductions or reversals of the punitive damages," and that this understated the importance of review, because so many awards are reduced by the trial court or settled for less pending appeal.[100]
 
 
 109
 Before Oberg, we would not disturb punitive damage awards unless it appeared that the jury was influenced by passion or prejudice.[101] However, as we explained in Ace v. Aetna Life Insurance Co., under Oberg, we must consider whether a punitive damages award passes "muster under federal due process analysis" in addition to reviewing whether the evidence is sufficient as a matter of law to support the award.[102] The test of whether a punitive damages award survives review cannot be merely whether there is any evidence to support it, under Oberg.
 
 
 110
 Two critical Supreme Court opinions, decided after the district court's decision in this case, have expanded the way courts review constitutional challenges to large punitive damage awards. In 1996, the Court decided BMW of North America, Inc. v. Gore and articulated, for the first time, factors that courts must consider when conducting a substantive review of a jury's punitive damages award.[103] In BMW, a jury awarded the plaintiff $4,000 in compensatory damages and $4 million in punitive damages for the defendant's fraudulent conduct. The Court held that the amount of the punitive damage award was unconstitutional because the defendant lacked fair notice that such a severe award would be imposed.[104] In concluding the award violated the Due Process Clause, the Court established three "guideposts" for courts to use in determining whether a punitive damage award is grossly excessive: (1) the reprehensibility of the defendant's conduct; (2) the ratio of the award to the harm inflicted on the plaintiff; and (3) the difference between the award and the civil or criminal penalties in comparable cases.[105]
 
 
 111
 The Court reaffirmed the importance of the BMW guideposts several months ago in Cooper Industries, Inc. v. Leatherman Tool Group, Inc..[106] Following a large punitive damages jury verdict, the defendant in that case challenged the amount of the award in the district court. Relying on BMW, the district court considered and rejected the argument that the award was grossly excessive.[107] On appeal, we reviewed the district court's determination for an abuse of discretion and affirmed. The Supreme Court reversed.
 
 
 112
 Cooper Industries examined the BMW factors to determine whether trial courts or appellate courts are in a better position to rule on the constitutionality of punitive damages awards, and ultimately concluded that "considerations of institutional competence" weigh in favor of independent appellate review.[108] Specifically, the Court held that "courts of appeal should apply a de novo standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards."[109] Because the Court's consideration of the BMW factors revealed "a series of questionable conclusions by the District Court," the Court remanded the case for us to conduct a thorough review of the district court's application of BMW.[110] Cooper Industries said "unlike the measure of actual damages suffered, which presents a question of historical or predictive fact, the level of punitive damages is not really a `fact' `tried' by the jury."[111] Thus, reduction of a punitive damages award does not implicate the Seventh Amendment. The Court in BMW and in Cooper Industries set out criteria for judicial review of jury awards for punitive damages.
 
 
 113
 In BMW, the Supreme Court held that a punitive damage award violated the Due Process Clause of the Fourteenth Amendment because it was so grossly excessive that the defendant lacked fair notice that it would be imposed.[112] Dr. Gore's car was damaged in transit, and BMW repainted it but did not tell Dr. Gore about the repainting when it sold him the car.[113] The jury found that to be fraudulent, and awarded $4,000 in compensatory damages for reduced value of the car and $4 million in punitive damages.[114] The Alabama Supreme Court cut the award to $2 million, but the Court held that it was still so high as to deny BMW due process of law for lack of notice, because the award exceeded the amounts justified under three "guideposts."[115] The BMW guideposts are: (1) the degree of reprehensibility of the person's conduct; (2) the disparity between the harm or potential harm suffered by the victim and his punitive damage award; and (3) the difference between the punitive damage award and the civil penalties authorized or imposed in comparable cases.[116] We apply these three guideposts to evaluate whether "a defendant lacked `fair notice' of the severity of a punitive damages award,"[117] and to stabilize the law by assuring the uniform treatment of similarly situated persons.[118]
 
 
 114
 In this case, the district court has not reviewed the award under the standards announced in BMW and Cooper Industries. This is because neither case had been decided at the time the jury returned its verdict, and, equally important, Exxon raised no direct constitutional challenges to the amount of the award until after the judgment. We therefore have no constitutional analysis by the district court over which to exercise any de novo review.[119] Because we believe the district court should, in the first instance, apply the appropriate standards, we remand for the district court to consider the constitutionality of the amount of the award in light of the guideposts established in BMW. We think on these facts, this is the better approach, and we provide the following analysis to aid their consideration.
 
 
 115
 A. Reprehensibility.
 
 
 116
 Punitive damages "are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence."[120] The Supreme Court explained that "[p]erhaps the most important indicum of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."[121] "[E]xemplary damages should reflect the enormity of [the defendant's] offense,"[122] and "punitive damages may not be grossly out of proportion to the severity of the offense."[123]
 
 
 117
 Degree of reprehensibility did not justify a $2 million punitive damages award in the BMW case for two reasons. First, the harm inflicted on Dr. Gore was "purely economic."[124] BMW's recklessness was toward a person's economic interest in getting a car that had never been damaged, not toward his health or safety. The court drew an analogy to criminal cases, noting that for purposes of reprehensibility, " `nonviolent crimes are less serious than crimes marked by violence.' "[125] Second, though fraudulent, BMW's conduct did not include active "trickery or deceit," just silence where there should have been disclosure.[126] Likewise in the case at bar, there was no violence, no intentional spilling of oil (as in a "midnight dumping" case), and no executive trickery to hide or facilitate the spill. Although the huge oil spill obviously caused harm beyond the "purely economic," the punitive damages award was expressly limited by the instructions to exclude environmental harm, as it had to be to avoid the res judicata bar discussed in Section I (C). The district court instructed the jury that in determining punitive damages "you should not consider any damage to natural resources or to the environment generally."[127] It explained that "[a]ny liability for punitive damages relating to these harms has been fully resolved in proceedings involving the Exxon defendants and the Natural Resource Trustees."[128] No party has challenged this instruction on appeal. The $5 billion punishment in this case was for injury to private economic interests claims of commercial fishermen that they made less money from fishing on account of the spill, claims of land owners that their shores were polluted with spilled oil, and claims of Alaska Natives that their subsistence fishing was impaired by the spill.
 
 
 118
 Plaintiffs correctly argue that Exxon's conduct was reprehensible because it knew of the risk of an oil spill in the transportation of huge quantities of oil through the icy waters of Prince William Sound. And it knew Hazelwood was an alcoholic who was drinking. But this goes more to justify punitive damages than to justify punitive damages at so high a level.
 
 
 119
 Also, the $5 billion punitive damages award at issue was against Exxon, which had some direct responsibility because it did not fire or transfer Hazelwood after learning that he was drinking and taking command despite his alcohol treatment, as well as vicarious responsibility. However, the difference between the $5,000 awarded as punitive damages against the man who directly caused the oil spill, and the $5 billion awarded as punitive damages against his employer gives rise to concern about jury evaluation of their relative reprehensibility.[129]
 
 
 120
 Some factors reduce reprehensibility here compared to some other punitive damages cases. Exxon spent millions of dollars to compensate many people after the oil spill, thereby mitigating the harm to them and the reprehensibility of its conduct. Reprehensibility should be discounted if defendants act promptly and comprehensively to ameliorate any harm they cause in order to encourage such socially beneficial behavior.
 
 
 121
 Also, as bad as the oil spill was, Exxon did not spill the oil on purpose, and did not kill anyone. By contrast, in Protectus Alpha, a man was foreseeably killed by a deliberate act.[130] And in Hilao v. Estate of Marcos, a $1.2. billion punitive damages award, the defendant intentionally caused thousands of people to be tortured and killed.[131]
 
 
 122
 B. Ratio.
 
 
 123
 "The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff."[132] This analysis is based upon the "principle that exemplary damages must bear a `reasonable relationship' to compensatory damages."[133] The harm to be considered includes both the actual harm to the victim and the harm that was likely to occur.[134]
 
 
 124
 The "reasonable relationship" ratio is intrinsically somewhat indeterminate. The numerator is "the harm likely to result from the defendant's conduct."[135] The denominator is the amount of punitive damages. Because the numerator is ordinarily arguable, applying a mathematical bright line as though that were an objective measure of how high the punitive damages can go would give a false suggestion of precision. That is one reason why the Supreme Court has emphasized that it is not possible to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case."[136] Nevertheless, a "general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus."[137] Part of why the Court held that the punitive damages were excessive in BMW was a "breathtaking 500 to 1" ratio between the harm to the plaintiff himself and the award.[138]
 
 
 125
 Although it is difficult to determine the value of the harm from the oil spill in the case at bar,[139] the jury awarded $287 million in compensatory damages, and the ratio of $5 billion punitive damages to $287 million in compensatory damages is 17.42 to 1. The district court determined that"total harm could range from $288.7 million to $418.7 million,"[140] which produces a ratio between 12 to 1 and 17 to 1. This ratio greatly exceeds the 4 to 1 ratio that the Supreme Court called "close to the line" in Pacific Mutual Life Ins. Co. v. Haslip.[141]
 
 
 126
 The amount that a defendant voluntarily pays before judgment should generally not be used as part of the numerator, because that would deter settlements prior to judgment. "[T]he general policy of federal courts to promote settlement before trial is even stronger in the context of large-scale class actions," such as this one.[142]
 
 
 127
 The cleanup expenses Exxon paid should be considered as part of the deterrent already imposed. Depending on the circumstances, a firm might reasonably, were there no punishment, be deterred, in some cases but not all, by its actual expenses. For example, a person painting his trim may not carefully mask window glass, because it is cheaper and easier to scrape the paint off the glass than to mask it carefully. But if a person ruined a $10,000 rug by spilling a $5 bottle of ink, he would be exceedingly careful never to spill ink on the rug again, even if it cost him "only" $10,005 and he was not otherwise punished.
 
 
 128
 Exxon's casualty losses for the vessel and cargo (approximately $46 million),[143] the costs of clean up (approximately $2.1 billion), the fine and restitution (approximately $125 million), settlement with the government entities (approximately $900 million), settlements with private parties (approximately $300 million), and the net compensatory damages (approximately $19.6 million) totaled over $3.4 billion. Whether cost of cleanup and compensatory damages, damage to the vessel, and lost oil deters bad future acts depends on whether it greatly exceeds the expense of avoiding such accidents, not whether the amounts are compensatory or punitive. A company hauling a cargo worth around $25.7 million has a large incentive to avoid a $3.4 billion expense for the trip. This case is like the ink on the rug example, not the paint on the window example. Just the expense, without any punishment, is too large for a prudent transporter to take much of a chance, given the low cost of making sure alcoholics do not command their oil tankers. Because the costs and settlements in this case are so large, a lesser amount is necessary to deter future acts.
 
 
 129
 Ratio analysis as required by BMW helps avoid overdeterrence. Justice Breyer's concurrence in BMW notes that "[s]maller damages would not sufficiently discourage firms from engaging in the harmful conduct, while larger damages would over-deter by leading potential defendants to spend more to prevent the activity that causes the economic harm, say, through employee training, than the cost of the harm itself."[144] It is hard to deter bad conduct without also deterring some good conduct that risks being misunderstood as bad, or that will look bad in retrospect. Every large company knows that it cannot exercise absolute control over all its employees, so if there is too much risk in performing some activity, the entire activity may be avoided as a preferable alternative to bearing potentially infinite costs of avoiding the harm, and society would lose the benefit of the productive activity. As bad as the oil spill is, fuel for the United States at moderate expense has great social value and that value as well as the value of avoiding horrendous oil spills can be reconciled by ratio analysis.
 
 
 130
 C. Comparable penalties.
 
 
 131
 The third BMW "indicium of excessiveness " is the penalties, civil or criminal, "that could be imposed for comparable misconduct."[145] The purpose of this particular indicium is to "accord `substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue."[146] One reason the Court held that the $2 million punitive damages award was so excessive as to deny BMW due process of law, even though the corporation could easily pay it, was that the statutory sanctions were much lower than the punitive damages award.[147]
 
 
 132
 This case is unusually rich in comparables. Both the state and federal governments pursued sanctions and obtained judicial approval for the amounts. Thus, we know the state and federal legislative and executive judgments, both in general and as applied to this case, about what sanctions were appropriate.
 
 
 133
 Criminal fines are particularly informative because punitive damages are quasi-criminal.[148] The parties agree that 18 U.S.C. &#167 3571 is the federal measure for fines in this case. It provides for up to a $500,000 fine for a felony, or for a misdemeanor resulting in death, or $200,000 for a class A misdemeanor not resulting in death.[149] If $200,000 is the relevant legislative comparable judgment, then the punitive damages were twenty-five thousand times the legislative judgment, an excessiveness problem like BMW. Plaintiffs argue that we should use subsection (d) instead. That subsection provides an alternative fine where a "person derives pecuniary gain from the offense," or the offense "results in pecuniary loss" to another person, "not more than the greater of twice the gross gain or twice the gross loss."[150] The district court calculated damages to others as $386.7 million to $516.7 million. Doubling the highest number suggests an exposure to a criminal fine of $1.03 billion. The plaintiffs would double various additional figures, most importantly the $2.1 billion Exxon spent cleaning up the spill, but that would not be included in the &#167 3571(d) fine, because it is damage to Exxon itself, and the fine doubles only "loss to a person other than the defendant."[151]
 
 
 134
 Ceilings on civil liability are also instructive. Congress provided in the Trans-Alaska Pipeline Act that "if oil that has been transported through the trans-Alaska pipeline is loaded on a vessel at the terminal facilities of the pipeline, the owner and operator of the vessel . . . shall be strictly liable . . . for all damages, including clean-up costs, sustained by any person or entity, public, or private, including residents of Canada, as the result of discharges of oil from such vessel."[152] However, "[s]trict liability for all claims arising out of any one incident shall not exceed $100,000,000."[153] That $100 million sanction is only 1/50 of the punitive damages award.
 
 
 135
 In addition to the legislative judgment, we have an actual penal evaluation made in this case by the attorneys general of the United States and the State of Alaska. Exxon and the United States entered a plea agreement for $150 million, which was subsequently reduced to a $25 million fine plus $100 million in restitution. This plea agreement was approved by the district court. At Exxon's sentencing hearing, the U.S. Attorney explained that "[a]s a result [of the money Exxon agreed to pay under the Consent Decree], the total amount of the penalties, compensatory payments, and other voluntary expenditures will exceed 3.5 billion dollars" and that it was "hard to imagine a more adequate deterrence for negligence, [sic] but unintentional conduct." The Alaska Attorney General expressed similar views, indicating that the $150 million fine was "a number which the State can hold up to whether [sic] polluters that this is the fine which you face, 150 million dollars, and that certainly should be sufficient, the State believes to give pause to those who do not show the proper regard for the Alaska environment." In approving the consent decree, the district judge indicated that "it contain[ed ] an appropriate amount of punishment."
 
 
 136
 The district judge subsequently explained why the $150 million was not, after all, the appropriate amount of punishment, when he denied the motion for new trial on punitive damages, by noting that "the criminal payment was made before the harm to plaintiffs was quantified." While not a limit, the fine is nevertheless a significant datum, because the massiveness of the spill was apparent immediately, and the $150 million represents an adversarial judgment by the executive officers of the state and federal governments who had the public responsibility for seeking the appropriate level of punishment.
 
 
 137
 Because of the importance of the Exxon Valdez oil spill, Congress revised federal law to assure that such spills would be adequately deterred and punished in the future.[154] Obviously Exxon could not have had notice of an Act passed after the spill. Nevertheless, the Oil Pollution Act has value as a legislative judgment, made in the course of legislative evaluation of this particular oil spill, of what amount of punishment serves the public interest in deterring and punishing, but not overdeterring, the conduct that caused the spill.[155] Congress sought to deter pollution, but not so aggressively as to deter transporting oil. Under the Act, the owner of vessels from which oil is discharged on account of "gross negligence or willful misconduct" is subject to a civil penalty of "not more than $3,000 per barrel of oil . . . discharged."[156] The Exxon Valdez spilled 11 million gallons, which is 261,905 barrels.[157] Thus, Congress's retrospective judgment made as it considered this oil spill was that the maximum permissible civil penalty for a grossly negligent spill as big as the Exxon Valdez ought to be no more than $786 million.
 
 
 138
 D. Summary.
 
 
 139
 The $5 billion punitive damages award is too high to withstand the review we are required to give it under BMW[158] and Cooper Industries.[159] It must be reduced. Because these Supreme Court decisions came down after the district court ruled, it could not apply them. We therefore vacate the award and remand so that the district court can set a lower amount in light of the BMW and Cooper Industries standards.
 
 
 140
 V. Juror misconduct.
 
 
 141
 Exxon argues that the jury improperly considered material somehow obtained outside the evidence, which showed that Hazelwood had either been convicted of driving under the influence or had his driver's license revoked. About a year after the trial and following extensive motion practice, the district court held an evidentiary hearing in which ten of the jurors and the husband of the eleventh were questioned under oath to find out whether jurors had been exposed to any extrinsic evidence.
 
 
 142
 Most of the jurors said they had no information about Hazelwood's driving record in the evidence, a few thought they had learned about it or inferred it from the evidence such as Hazelwood's personnel record, and a few knew about it but were uncertain when or where they had learned about it. Based upon an affidavit describing an examination of all the transcripts and exhibits, the district court found that there was no evidence of Hazelwood's conviction or license revocation, so the jurors who testified to the contrary were confused about where they had learned it. The court therefore made a finding of fact that "the jurors were not exposed to extraneous information about Captain Hazelwood."
 
 
 143
 "Where extraneous information is imparted, as when papers bearing on the facts get into the jury room without having been admitted as exhibits, or when a juror looks things up in a dictionary or directory, the burden is generally on the party opposing a new trial to demonstrate the absence of prejudice, and a new trial is ordinarily granted if there is a reasonable possibility that the material could have affected the verdict."[160] Before we apply the standard for what to do when extraneous information was imparted, it has to have been imparted. The district court found that it was not. The district court's findings of fact are reviewed for clear error.[161] Exxon argues that the district court "inexplicably" so found because some jurors had testified to the contrary and some of the judge's questions were not well phrased. The argument is weightless. There is nothing inexplicable about a person having trouble recalling accurately whether he learned something during a trial or deliberations, or during a subsequent year of intensive media publicity about the trial. The questions were well within the district court's discretion and appear to us to have been carefully designed to determine the truth. There is no basis for the argument that the district court's finding of no extraneous information was clearly erroneous.
 
 
 144
 VI. Compensatory Awards.
 
 
 145
 Exxon argues that the jury verdict "contained indefensible awards" of compensatory damages of $22 million for chum salmon fishermen and of $30 million for setnetter fishermen. Exxon argues that it should have been granted judgment as a matter of law to correct these "errors" by the jury.
 
 
 146
 We review a jury verdict of compensatory damages for substantial evidence,[162] and "will not disturb an award of damages unless it is clearly unsupported by the evidence."[163] We afford "substantial deference to a jury's finding of the appropriate amount of damages,"[164] and we "must uphold the jury's findings unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork."[165]
 
 
 147
 Exxon's argument is that when we apply the theories offered by its expert witnesses to the data on fish catches in different years, it is not possible to arrive at the numbers the jury did. These numbers and theories depended on several unknown factors, such as whether the price of certain kinds of fish went down because buyers feared oil contamination or because farmed salmon became a significant competitor of wild salmon, and how much fish would have been caught over the course of several years had there not been an oil spill. Exxon argues that a jury may not reject all the expert testimony and "pick out of the air a number," citing for that proposition our decisions in Rebel Oil Co. v. Atlantic Richfield Co.,[166] Claar v. Burlington Northern Railroad Co.,[167] and the District of Columbia Circuit's decision in Lewis v. Washington Metropolitan Area Transit Authority.[168]
 
 
 148
 Exxon's citations are not at all in point, and it is puzzling that the brief uses them for the proposition for which they are cited. Rebel Oil is an appeal from a summary judgment, and has nothing to do with whether a jury has to follow an expert.[169] Likewise Claar.[170] Lewis at least has the relevance that it involves an appellate challenge to a jury verdict,[171] but it is also not in point. The question was whether a woman's wrist and knee injuries were caused by a bus accident, and it was controlled by District of Columbia law requiring expert testimony to support causation, which the plaintiff had failed to present.[172] No such principle of law has been cited to us in this case.
 
 
 149
 Nor is Exxon's argument on the facts so compelling as to exclude the possibility that a reasonable jury could go any other way. While Exxon presents a plausible argument against the soundness of the damages awards, the complexity and uncertainty of these damages questions left room for reasonable jurors to take many paths. Reasonable jurors need not accept the views of one side's expert or the other's, but may make their own reasonable judgment on the evidence, accepting part, all, or none of any witness's testimony.
 
 
 150
 VII. Hazelwood's separate appeal.
 
 
 151
 Hazelwood's separate appeal challenges two evidentiary rulings.
 
 
 152
 A. Blood Test Results.
 
 
 153
 Exxon and Hazelwood moved in limine to exclude evidence of a .061% blood alcohol level in samples taken eleven hours after the Exxon Valdez ran aground on Bligh Reef. Expert testimony was offered to show that if he still had that much alcohol in his blood eleven hours later, he must have been deeply under the influence when he abandoned the bridge to the third mate.
 
 
 154
 The district court, despite noting "remarkable mishandlings" of the blood samples, denied the motion in limine.[173] Its reasons were that any change in the blood from bad storage would have been observed and noted by the laboratory technicians, and that the evidence on chain of custody regarding sealed tubes with Hazelwood's name and social security number on them was good enough so that reasonable jurors could conclude that the tubes contained Hazelwood's blood. Hazelwood argues on appeal that because of improper storage and because of a discrepancy between the color of the stoppers in the evidence log and the lab notes, the evidence should not have been admitted.
 
 
 155
 We review evidentiary rulings for abuse of discretion.[174] The authentication of evidence is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."[175] The district court properly exercised its discretion according to the correct standard, which is whether "a reasonable juror could find" that the tested specimens were Hazelwood's.[176]
 
 
 156
 Hazelwood argues that authentication was inadequate as a matter of law, under Iran v. INS.[177] Iran is not in point. It merely rejects the contention made by the Immigration and Naturalization Service that no authentication of documents at all was necessary to have them admitted at deportation hearings.[178] In this case, there was authentication.[179] Though the challenge to authenticity was plausible, the challenge was not so compelling as to render admission an abuse of discretion. If a witness offers testimony from which a reasonable juror could find in favor of authenticity, the trial court may properly admit the evidence to allow the jury to decide what probative force it has.[180]
 
 
 157
 B. Individual Disability Report.
 
 
 158
 Hazelwood and Exxon sought an in limine order to exclude a physician's report from 1985 that diagnosed him as having "dysthemia" and "alcohol abuse-episodic. " Hazelwood argues on appeal that admission of the report violated his state physician-patient privilege and federal regulations relating to alcohol treatment.
 
 
 159
 The report was made on an Exxon form called an Individual Disability Report that Hazelwood provided. It is a doctor's excuse that the company requires when an employee misses more than five days of work because of claimed illness. The doctor sent the form to the company, rather than maintaining it in his confidential files.
 
 
 160
 The Alaska Rules of Evidence protect against disclosure of "confidential communications made for the purpose of diagnosis or treatment."[181] A doctor's excuse sent to the patient's employer is not shielded by this rule.[182] Even if the form and the testimony relating to it were covered by the federal confidentiality rule, admission of this record was within the court's discretion,[183] and was harmless in any event because of the overwhelming evidence from other sources establishing the matter at issue, that Hazelwood had the alcohol problem the record tended to prove.
 
 
 161
 VIII. Plaintiffs' cross appeal.
 
 
 162
 Plaintiffs cross appeal. They argue that the district court erroneously granted summary judgment against the claimants who suffered purely economic injury on account of the oil spill. And they argue that if the punitive damages award were reversed, then certain rulings on evidence and instructions were erroneous and should be corrected for retrial.
 
 
 163
 A. Economic injury.
 
 
 164
 The district court granted summary judgment against all claimants who suffered only economic injury on account of the oil spill, unaccompanied by any physical injury to their property or person. It relied on the United States Supreme Court's decision in Robins Dry Dock & Repair Co. v. Flint,[184] a case commonly read to hold that economic recovery is unavailable in admiralty cases absent physical harm, and our decision in Union Oil Co. v. Oppen,[185] which recognized a commercial fisherman's exception to the Robins Dry Dock rule. Based on the understanding that state law may not conflict with federal maritime law, the district court held that Robins Dry Dock preempted Alaska's strict liability statute for hazardous substances. In light of subsequent Supreme Court decisions, we are compelled to reverse the district court's ruling in part.
 
 
 165
 Whether the dismissed claimants may recover depends on two inquiries: whether state law can control despite Robins Dry Dock, and whether Alaska law does indeed allow for recovery. The first question has been recently addressed by the United States Supreme Court. In American Dredging Co. v. Miller[186] and Yamaha Motor Corp. v. Calhoun,[187] the Supreme Court reaffirmed the three-prong test articulated almost a century ago in Southern Pacific Co. v. Jensen,[188] as the proper analysis for determining whether federal admiralty law preempts contrary state law. Interpreting the"saving to suitors clause" of the 1789 Judiciary Act, the Supreme Court held that, notwithstanding federal admiralty law, a state may "adopt such remedies . . . as it sees fit" so long as the state remedy does not (1) "contravene[ ] the essential purpose expressed by an act of Congress;" (2) "work[ ] material prejudice to the characteristic features of the general maritime law"; or (3) "interfere[ ] with the proper harmony and uniformity of that law in its international and interstate relations."[189] Whether contrary state law can control despite Robins thus depends on whether the denial of recovery for pure economic injury is the "essential purpose" of an act of Congress, a "characteristic feature" of admiralty, or a doctrine whose uniform application is necessary to maintain the "proper harmony" of maritime law.[190] Like the First Circuit, we think it is none of these.[191]
 
 
 166
 The first question is easily disposed of: no act of Congress directly governs our case.[192] The second prong of the Jensen test requires preemption where a state remedy "works material prejudice to [a] characteristic featur[e] of the general maritime law." In American Dredging, the Court held that the "characteristic feature" language of Jensen refers only to a federal rule that either "originated in admiralty " or "has exclusive application there."[193] Where a federal rule "is and has long been a doctrine of general application, " a state's refusal to follow that rule does not "work `material prejudice to [a] characteristic featur[e] of the general maritime law.'"[194]
 
 
 167
 As the First Circuit has held, the Robins Dry Dock rule denying purely economic losses neither "originated in admiralty" nor "had `exclusive' application in admiralty."[195] Justice Holmes' opinion in Robins Dry Dock presents the rule as a truism for which "no authority need be cited, " and cites four cases that have applied the rule, only two of which are in admiralty.[196] It is a traditional rule of tort law.[197] Commentators trace the Robins Dry Dock rule to a non-admiralty case decided in 1875.[198] And courts, including our own, have repeatedly denied liability for purely economic harm in a variety of landbased contexts. As the Fifth Circuit noted in M/V Testbank, "[Robins Dry Dock] broke no new ground but instead applied a principle, then settled both in the United States and England, which refused recovery for negligent interference with `contractual rights.' "[199] Thus, a state's decision to depart from Robins Dry Dock does not materially prejudice a rule that "originated in" or is "exclusive to" general maritime law, and cannot be preempted on this ground.
 
 
 168
 State law allowing for recovery of purely economic damage can be preempted, therefore, only if it "interferes with the proper harmony and uniformity" of maritime law.[200] The Supreme Court has adopted a balancing test that weighs state and federal interests on a case-by-case basis.[201]
 
 
 169
 In undertaking this balancing test, we first look to the state interest in providing remedies for damages caused by oil spills. The Alaska Supreme Court has expressly recognized the state's "strong interest in regulating oil pollution and in providing remedies for damages caused by oil spills."[202] The United States Supreme Court has similarly recognized that regulating oil pollution and providing for recovery of economic damages is within the state's police powers, and is not preempted by federal law.[203] Because it is undisputed that "general maritime law may be changed, modified, or affected by state legislation,"[204] where "the state law is aimed at a matter of great and legitimate state concern, a court must act with great caution," before declaring the state remedy" potentially so disruptive as to be unconstitutional."[205]
 
 
 170
 Accordingly, we must balance a state's "great and legitimate" interest in protecting its citizens from oil spill-related injury against the federal interest in barring recovery for pure economic harm. The federal interest in maintaining a uniform rule of recovery in admiralty is "more subtle but also not without importance."[206] It aims to contain costs potentially imposed on maritime commerce by a regime of liability, or a diversity of regimes, that are not so difficult to administer as to prevent the efficient and predictable resolution of maritime disputes.
 
 
 171
 Two federal laws establish the absence of a federal policy against awards for purely economic harm, the Oil Pollution Act ("OPA")[207] and the Trans-Alaska Pipeline Authorization Act ("TAPAA").[208] The First Circuit concluded that OPA "almost certainly provides for recovery of purely economic damages in oil spill cases" even where the claimant does not have a proprietary interest in the damaged property or natural resources.[209] The same has been said of TAPAA.[210] Both OPA and TAPAA, moreover, expressly provide that they do not preempt state imposition of additional liability requirements.[211] These statutes offer "compelling evidence that Congress does not view either expansion of liability to cover purely economic losses or enactment of comparable state oil pollution regimes as an excessive burden on maritime commerce."[212]
 
 
 172
 In light of these considerations, the balance tips in favor of the state: "Alaska's strong interest in protecting its waters and providing remedies for damages resulting from oil spills outweighs the diminished federal interest in achieving interstate harmony through the uniform application of Robins."[213]
 
 
 173
 Whether the dismissed claimants can recover depends, therefore, on whether economic recovery is indeed available under Alaska law. The Alaska Supreme Court has recently addressed this issue under Alaska's strict liability statute for hazardous substances, Alaska Stat. &#167 46.03.822.[214]
 
 
 174
 This expansion of liability to purely economic harm does not establish liability for all the claims plaintiffs advance. As we held in Benefiel v. Exxon Corp.[215] the requirement of proximate cause bars remote and speculative claims. There we held that Californians who claimed that their gasoline cost more as a result of the Exxon Valdez oil spill were barred from recovery because of "the remote and derivative damages" they claimed and lack of proximate cause as a matter of law.[216]
 
 
 175
 We remand so that the district court can determine whether tenderboat operators and crews, and seafood processors, dealers, wholesalers, and processor employees can establish allowable damages. Summary judgment was appropriately granted against "area businesses, " "commercial fishermen outside the closed areas," the aquaculture association, and persons claiming "stigma" damages. Even without Robins Dry Dock, these groups' damages were too remote.
 
 
 176
 B. Conditional Cross-Appeals.
 
 
 177
 Plaintiffs argue that if the judgment is reversed in any respect, we should also reverse certain evidentiary and instructions determinations made by the trial court. We decline to do so.
 
 
 178
 First, plaintiffs say that the trial court erred in excluding some evidence of Hazelwood's drinking, drunkenness, and leaving the bridge during the early 1980's, before he went to a hospital for alcohol treatment. The district court excluded the evidence because much other evidence, closer in time and more relevant, of substantially the same conduct came in. The excluded evidence was of lesser relevance because it was remote in time, was likely to cause confusion, and would waste time as there would be a trial within the trial about whether the highly disputed allegations were true. This was within the district court's discretion.[217]
 
 
 179
 Plaintiffs also argue that the district court erred by excluding evidence of Hazelwood's two criminal convictions for driving while under the influence of alcohol. The district court excluded them for various reasons, among which were that the risk of unfair prejudice outweighed the relevance, particularly because Exxon did not know about them, because Hazelwood's misconduct with his own car on his own time had limited value in proving what he did on company time with the company's oil tanker, and because the offer of proof suggested use of character to prove conduct.[218] Though plaintiffs make a good argument for admitting the evidence, we cannot say that the district court abused its discretion in keeping it out. Nor, considering the evidence of alcohol abuse that came in, is there any significant possibility that the outcome was affected by the exclusion.[219]
 
 
 180
 The same applies to the other challenged rulings, which excluded evidence that Hazelwood had five to seven drinks on an airplane flight a few days after the oil spill, and limited an expert witness's reliance on the excluded material. The district court's exclusion of evidence relating to whether a punitive damages award of the magnitude of this one was "material" to Exxon's financial condition was within its discretion for the reason the court gave, that "materiality" was a subjective accounting judgment not helpful to the jury.[220] The district court also did not abuse its discretion in refusing to admit evidence of Exxon's insurance coverage.
 
 
 181
 Likewise plaintiffs' disputes about the formulation of jury instructions go to exercises of discretion, and the district court has broad discretion in the formulation of instructions.[221] It was not abused.
 
 Conclusion
 
 182
 The judgment is affirmed in part, vacated in part, and remanded for proceedings consistent with this opinion. Each party to bear its own costs.
 
 
 
 Notes:
 
 
 *
 The original panel, consisting of Judge Browning, Judge Wiggins, and Judge Kleinfeld, heard oral argument on May 3, 1999. Judge Wiggins died on March 2, 2000, while the decision was pending, and Judge Schroeder was drawn to replace him. She has read the briefs, reviewed the record, and listened to the tape of oral argument.
 
 
 [1]
 See Eyak Native Village v. Exxon Corp., 25 F.3d 773, 774 (9th Cir. 1994).
 
 
 [2]
 Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 121 S. Ct. 1678, 1683 (2001); Morgan v. Woessner, 997 F.2d 1244, 1256 (9th Cir. 1993); see also Hawkins v. United States, 30 F.3d 1077, 1083-84 (9th Cir. 1994) (describing punitive damages as a windfall).
 
 
 [3]
 121 S. Ct. 1678 (2001).
 
 
 [4]
 Hubert Howe Bancroft, History of Alaska 277-81 (1886); Donald J. Orth, Dictionary of Alaska Place Names, entries for Bligh Island, Bligh Reef (Geological Survey Professional Paper 567 1971), available in Alaska Place Names Dictionary on CD-ROM (Scarp Exploration, Inc. 1998).
 
 
 [5]
 Donald J. Orth, Dictionary of Alaska Place Names, entries for Bligh Island, Bligh Reef (Geological Survey Professional Paper 567 1971), available in Alaska Place Names Dictionary on CD-ROM (Scarp Exploration, Inc. 1998).
 
 
 [6]
 David Waters, Navigational Problems in Captain Cook's Day, in Exploration in Alaska 41, 55 (Antoinette Shalkop, ed. 1980).
 
 
 [7]
 IV Encyclopaedia Britannica (11th Ed. 1910).
 
 
 [8]
 See Underhill v. Royal, 769 F.2d 1426, 1435 (9th Cir. 1985).
 
 
 [9]
 D.R. 10/1149.
 
 
 [10]
 See Eyak Native Village v. Exxon Corp., 25 F.3d 773, 774 (9th Cir. 1994).
 
 
 [11]
 Id. at 774.
 
 
 [12]
 See Baker v. Exxon Corp., 239 F.3d 985 (9th Cir. 2001) (explaining that a defendant may require settling plaintiffs to assign their right to share in any punitive damage award as a condition of settlement); Icicle Seafoods, Inc. v. Exxon Shipping Co., 229 F.3d 790 (9th Cir. 2000) (holding that cede-back agreements are enforceable and should not be revealed to a jury); Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Service Co., 206 F.3d 900 (9th Cir. 2000) (holding that the defendants were not prejudiced by a bailiff's inappropriate ex parte contact with a juror and that a district court's findings about alleged threats to one juror by other jurors were not clearly erroneous); Payne v. Exxon Corp., 121 F.3d 503 (9th Cir. 1997) (concluding that the district court had the authority to dismiss the plaintiff's maritime negligence claim against the second defendant even though the first defendant had made discovery requests of the second defendant); Exxon Shipping Co. v. Airport Depot Diner, Inc. , 120 F.3d 166 (9th Cir. 1997) (vacating declaratory judgment on certain issues from the spill for improperly preempting the state court); Alaska Native Class v. Exxon Corp., 104 F.3d 1196 (9th Cir. 1997) (holding that the Alaska natives failed to prove special injury to communal life warranting recovery of non-economic damages for public nuisance); Allen v. Exxon Corp., 102 F.3d 429 (9th Cir. 1996) (holding that the district court did not abuse its discretion in dismissing cases with prejudice as a discovery sanction); Adkins v. Trans-Alaska Pipeline Liability Fund, 101 F.3d 86 (9th Cir. 1996) (stating that the Fund rule limiting the time to request reconsideration and barring the submission of new documents did not violate due process and that the Fund properly denied claims that were too causally or geographically remote); Youell v. Exxon Corp. , 74 F.3d 373 (2d Cir. 1996) (explaining that a federal court is required to hear the case of whether global corporate excess insurance covered the loss from the spill despite parallel state court proceedings because it concerns a novel issue of federal admiralty law); Exxon Shipping Co. v. U.S. Dept. of Interior, 34 F.3d 774 (9th Cir. 1994) (explaining that the federal housekeeping statute permitting an agency head to regulate employee conduct and have custody of certain records does not create a privilege or shield an employee from subpoena); Alaska Sport Fishing Ass'n v. Exxon Corp., 34 F.3d 769 (9th Cir. 1994) (holding that the United States and the State of Alaska as public trustees under the CWA and CERCLA could recover all lost use damages caused by the spill and that private claims for lost recreational use were barred under res judicata); Eyak Native Village v. Exxon Corp., 25 F.3d 773 (9th Cir. 1994) (holding that the pipeline company's notice of removal more than a year after it became aware of the nature of the plaintiffs' claims was untimely); Benefiel v. Exxon Corp. , 959 F.2d 805 (9th Cir. 1992) (affirming the dismissal for failure to state a claim of consumers who sought damages for the increased prices they had to pay for gas because of the spill); SeaRiver Maritime Financial Holdings, Inc. v. Slater, 35 F. Supp. 2d 756 (D. Alaska 1998) (stating that the dispute over whether the Exxon Valdez had been unconstitutionally barred from Prince William Sound was barred by the consent decree which provided that the parties were settling all claims); SeaRiver Maritime Financial Holdings, Inc. v. Pena, 952 F. Supp. 9 (D.D.C. 1997) (holding that forum non conveniens counseled transfer to Alaska of the case challenging a section of the Oil Pollution Act which prohibited the oil tanker from traveling in the Prince William Sound); SeaRiver Maritime Financial Holdings, Inc. v. Pena, 952 F. Supp. 455 (S.D. Tex. 1996) (dismissing complaint without prejudice for improper venue); In re Exxon Valdez, 142 F.R.D. 380 (D.D.C. 1992) (granting plaintiffs' request for an order enforcing a non party subpoena of American Petroleum Institute's documents); In re Exxon Valdez, 767 F. Supp. 1509 (D. Alaska 1991) (denying pipeline company's motion for judgment on the pleadings); Chenega Corp. v. Exxon Corp., 991 P.2d 769 (Alaska 1999) (concluding that the Oil Pollution Act assigned to a native corporation federal claims for spill related harm to federal lands and that the superior court erred by precluding the jury from considering these claims); Kodiak Island Borough v. Exxon Corp., 991 P.2d 757 (Alaska 1999) (reversing summary judgment against municipalities seeking to recover diverted services damages from their response to the oil spill because their claims were authorized by state statute); State v. Hazelwood, 946 P.2d 875 (Alaska 1997) (stating that the mens rea requirement for the negligent discharge of oil could be satisfied by the civil negligence standard without violating the defendant's due process rights under the Alaska constitution); State v. Hazelwood, 866 P.2d 827 (Alaska 1993) (explaining that the doctrine of inevitable discovery applies to statements immunized because they involved the report of an oil spill); Hazelwood v. State, 962 P.2d 196 (Alaska App. 1998) (affirming Hazelwood's conviction for the negligent discharge of oil because the erroneous admission of evidence was harmless beyond a reasonable doubt).
 
 
 [13]
 Restatement (Second) of Torts &#167 908, cmt. a (1979) (explaining that punitive damages in a civil case are not to be granted or not granted based on a prior criminal conviction).
 
 
 [14]
 See, e.g., The Amiable Nancy, 16 U.S. 546, 558 (1818) (explaining that "if this were a suit against the original wrong-doers," punishment by exemplary damages might be appropriate); South Port Marine, LLC v. Gulf Oil Limited Partnership, 234 F.3d 58, 64-65 (1st Cir. 2000) (explaining that general admiralty and maritime law "has traditionally provided for the general availability of punitive damages for reckless conduct" but holding that punitive damages are not available under the Oil Pollution Act); In re Amtrak "Sunset Limited" Train Crash, 121 F.3d 1421, 1423 (11th Cir. 1997) ("[T]he general maritime law does not allow for the recovery of punitive damages except on a showing of willful and wanton misconduct."); CEH, Inc. v. F/V Seafarer , 70 F.3d 694, 699 (1st Cir. 1995) ("Although rarely imposed, punitive damages have long been recognized as an available remedy in general maritime actions where defendant's intentional or wanton and reckless conduct amounted to a conscious disregard of the rights of others."); Churchill v. F/V Fjord, 892 F.2d 763, 772 (9th Cir. 1988) ("Punitive damages are available under the general maritime law."); Protectus Alpha Navigation Co., Ltd. v. North Pacific Grain Growers, Inc., 767 F.2d 1379, 1385 (9th Cir. 1985) (holding that the dock owners were vicariously liable for punitive damages); Thomas J. Schoenbaum, Admiralty and Maritime Law, Practitioner's Edition &#167 4-14 (1987) ("Punitive damages are available under the general maritime law if the conduct causing the injury is willful, wanton, grossly negligent, or unconscionable so as to evince a callous disregard for the rights of others.").
 
 
 [15]
 57 F.3d 1495 (9th Cir. 1995); see also Guevara v. Maritime Overseas Corp., 59 F.3d 1496, 1503 (5th Cir. 1995) (en banc) (holding that because the Jones Act limitations did not provide for punitive damages in the wrongful death and personal injury area, the plaintiff could not get punitive damages under general maritime law); Bergen v. F/V St. Patrick, 816 F.2d 1345, 1349 (9th Cir. 1989) ("We hold that where an action under DOSHA is joined with a Jones Act action, neither statutory scheme may be supplemented by the general maritime law or by state law" to allow an award of punitive damages).
 
 
 [16]
 Vaughan v. Atkinson, 369 U.S. 527, 531 (1962).
 
 
 [17]
 369 U.S. 527 (1962).
 
 
 [18]
 498 U.S. 19 (1990).
 
 
 [19]
 Glynn, 57 F.3d at 1505.
 
 
 [20]
 See 33 U.S.C. &#167 1321 (1994) historical and statutory notes ("applicable to incidents occurring after Aug. 18, 1990, see section 1020 of Pub.L. 101-380, set out as an effective date note under section 2701 of this title.").
 
 
 [21]
 33 U.S.C. &#167 1321(f)(5) (1990).
 
 
 [22]
 33 U.S.C. &#167 1321(b)(6)(B).
 
 
 [23]
 33 U.S.C. &#167 1321(b)(6)(A)-(B) (1990); 33 U.S.C. &#167 1321(f)(1) (1990).
 
 
 [24]
 33 U.S.C. &#167 1321(f)(1) (1990).
 
 
 [25]
 34 F.3d 769 (9th Cir. 1994).
 
 
 [26]
 Id. at 770; see also Alliance Against IFQ's v. Brown, 84 F.3d 343, 344 (9th Cir. 1996) (citing Pierson v. Post, 3 Caines 175, 2 Am. Dec. 264 (N.Y. 1805)).
 
 
 [27]
 Id).. at 773.
 
 
 [28]
 Cf. Carbone v. Ursich, 209 F.2d 178, 182 (9th Cir. 1953).
 
 
 [29]
 Satsky v. Paramount Communications, Inc., 7 F.3d 1464 (10th Cir. 1993) (holding that a consent decree between Colorado and a polluting corporation had a res judicata effect on all claims brought by the state but not on the private damage claims an individual might bring that differed from the claims in the consent decree).
 
 
 [30]
 Berkey v. Third Avenue Railway Co., 244 N.Y. 84, 94 (1926).
 
 
 [31]
 43 U.S.C. &#167 &#167 1651-56.
 
 
 [32]
 33 U.S.C. &#167 &#167 1251-1387.
 
 
 [33]
 United States v. Northrop Corp. , 59 F.3d 953, 957 n.2 (9th Cir. 1995).
 
 
 [34]
 See 33 U.S.C. &#167 1321(b)(6)(B) (1990). Exxon also points to 33 U.S.C. &#167 1319, which provides for fines and civil penalties for violations of effluent standards and permits. Civil penalties cannot be assessed under both &#167 1321 and &#167 1319 for the same discharge. 33 U.S.C. &#167 1321 (b)(6)(E) (1990). Because &#167 1321 directly treats oil spills from vessels, that is the section with which we concern ourselves.
 
 
 [35]
 498 U.S. 19 (1990).
 
 
 [36]
 453 U.S. 1 (1981).
 
 
 [37]
 See Miles, 489 U.S. at 37.
 
 
 [38]
 See id. at 32.
 
 
 [39]
 See Sea Clammers, 453 U.S. at 12.
 
 
 [40]
 33 U.S.C. &#167 &#167 1401-45.
 
 
 [41]
 See id. at 14, 21-22.
 
 
 [42]
 See id. at 21-22.
 
 
 [43]
 33 U.S.C. 1321(o)(1) (1990).
 
 
 [44]
 33 U.S.C. &#167 1365(e) (emphasis added).
 
 
 [45]
 Sea Clammers, 453 U.S. at 15-16.
 
 
 [46]
 451 U.S. 304 (1981).
 
 
 [47]
 See id. at 320.
 
 
 [48]
 33 U.S.C. &#167 1321(b)(6)(B) (1990).
 
 
 [49]
 730 F.2d 835 (1st Cir. 1984).
 
 
 [50]
 664 F.2d 327 (2d Cir. 1981).
 
 
 [51]
 Conner, 730 F.2d at 842.
 
 
 [52]
 Milwaukee v. Illinois, 451 U.S. 304, 320 (1981).
 
 
 [53]
 Oswego Barge, 664 F.2d at 331.
 
 
 [54]
 See id. at 331.
 
 
 [55]
 Id. at 344 (emphasis added).
 
 
 [56]
 See id. at 331.
 
 
 [57]
 See Herman & MacLean v. Huddleston, 459 U.S. 375, 387 (1983) ("In a typical civil suit for money damages, plaintiffs must prove their case by a preponderance of the evidence.").
 
 
 [58]
 See 19 U.S.C. 1592(e)(2) (Court of International Trade); 28 U.S.C. &#167 2244(b)(2)(B)(ii) (habeas petition); see also Santosky v. Kramer, 455 U.S. 745 (1982) (applying a clear and convincing standard in a proceeding to terminate parental rights); Addington v. Texas, 441 U.S. 418 (1979) (using a clear and convincing standard in an involuntary commitment proceeding); Woodby v. INS, 385 U.S. 276, 285-286 n.18 (1966) (requiring a clear and convincing standard in a deportation hearing and stating "[t]his standard, or an even higher one, has traditionally been imposed in cases involving allegations of civil fraud, and in a variety of other kinds of civil cases involving such issues as adultery, illegitimacy of a child born in wedlock, lost wills, oral contracts to make bequests, and the like.") (citing 9 Wigmore, Evidence &#167 2498 (3d ed. 1940)).
 
 
 [59]
 Honda Motor Co. v. Oberg, 512 U.S. 415, 433 (1994).
 
 
 [60]
 See Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23 n.11 (1991).
 
 
 [61]
 See id. ("We are not persuaded, however, that the Due Process Clause requires [a clear and convincing standard].").
 
 
 [62]
 16 U.S. 546 (1818).
 
 
 [63]
 See id. at 547.
 
 
 [64]
 See id. at 547, 550.
 
 
 [65]
 See id. at 547-48, 551.
 
 
 [66]
 Id. at 558
 
 
 [67]
 Id.
 
 
 [68]
 Id. at 559-60.
 
 
 [69]
 Id.
 
 
 [70]
 147 U.S. 101, 117 (1893).
 
 
 [71]
 Id. at 108 (quoting The Amiable Nancy, 16 U.S. 546, 559 (1818)).
 
 
 [72]
 Id. at 117.
 
 
 [73]
 The Amiable Nancy, 16 U.S. 546, 559 (1818).
 
 
 [74]
 Id.; cf. Kolstad v. American Dental Assoc., 527 U.S. 526 (1999) (explaining that, in a punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with Title VII).
 
 
 [75]
 136 F. 577 (9th Cir. 1905).
 
 
 [76]
 See id.
 
 
 [77]
 See id. at 579-80.
 
 
 [78]
 767 F.2d 1379 (9th Cir. 1985).
 
 
 [79]
 See id. at 1384.
 
 
 [80]
 Id. at 1386 (quoting Restatement 2d of Torts &#167 909 (1979)).
 
 
 [81]
 See id. at 1387.
 
 
 [82]
 See Beachy v. Boise Cascade Corp., 191 F.3d 1010, 1013 (9th Cir. 1999), cert. denied, 120 S.Ct. 1425 (2000) (noting that we review a district court's formulation of civil jury instructions for an abuse of discretion).
 
 
 [83]
 977 F.2d 1347, 1348 (9th Cir. 1992) (en banc) ("Unless an alternative method is provided by rule of this court, `[a] panel faced with such a[n] [intra-circuit] conflict must call for en banc review, which the court will normally grant.") (internal citations omitted).
 
 
 [84]
 Protectus Alpha was specifically rejected by the Fifth Circuit, and accepted only in part by the First Circuit. CEH, Inc. v. F/V Seafarer, 70 F.3d 694, 705 (1st Cir. 1995); Matter of P&E Boat Rentals, Inc., 872 F.2d 642, 652 (5th Cir. 1989) (en banc). The Sixth Circuit followed The Amiable Nancy, Lake Shore, and this circuit's opinion in Pacific Packing to hold that "punitive damages are not recoverable against the owner of a vessel for the act of the master unless it can be shown that the owner authorized or ratified the acts of the master either before or after the accident." United States Steel Corp. v. Fuhrman, 407 F.2d 1143, 1148 (6th Cir. 1969). Arguably Protectus Alpha, in relevant part, could have been dictum. Although it was not mentioned in the panel opinion, there was an express company policy that required the foreman to do exactly what he did, and the company expressly ratified what the foreman had done. See Protectus Alpha Nav. v. Pacific Grain Growers, 585 F. Supp. 1062, 1068 (1984). The district judge held the company liable for punitive damages on that basis, not on the basis that the foreman was a managerial employee. See id. at 1069. With this finding of fact, which was not challenged on appeal, there was no need to reach the question of whether the company would be vicariously liable for a managerial employee's conduct in the absence of a corporate policy authorizing and ratifying his conduct. But our decision in Protectus Alpha did not rely on that finding. We must leave whatever challenge might be made to Protectus Alpha to our court if it rehears this case en banc or to a higher court. We cannot hold that the district court abused its discretion by following our decision in Protectus Alpha.
 
 
 [85]
 United States v. Gay, 967 F.2d 322, 327 (9th Cir. 1992) (quoting United States v. Lancellotti, 761 F.2d 1363, 1366 (9th Cir. 1985)).
 
 
 [86]
 499 U.S. 1, 15 (1991).
 
 
 [87]
 Lake Shore & Michigan Southern Railway Co. v. Prentice, 147 U.S. 101, 108 (1893).
 
 
 [88]
 Lambert v. Ackerly, 180 F.3d 997, 1012 (9th Cir. 1999) (en banc); see also Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir. 2000).
 
 
 [89]
 Lytle v. Household Mfg., Inc., 494 U.S. 545, 554-55 (1990) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986)).
 
 
 [90]
 See Koirala v. Thai Airways Intl., Ltd., 126 F.3d 1205, 1211 (9th Cir. 1997) (explaining that a factfinder could infer from failure to perform fundamental duty of safe navigation that flight crew consciously disregarded that duty).
 
 
 [91]
 892 F.2d 763 (9th Cir. 1988).
 
 
 [92]
 Id. at 772.
 
 
 [93]
 Lambert, 180 F.3d at 1012.
 
 
 [94]
 See, e.g., Morgan v. Woessner, 997 F.2d 1244, 1257 (9th Cir. 1993).
 
 
 [95]
 Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir. 2000); Lambert v. Ackerly, 180 F.3d 997, 1012 (9th Cir. 1999) (en banc).
 
 
 [96]
 512 U.S. 415, 432 (1994).
 
 
 [97]
 Id. at 418.
 
 
 [98]
 Id. at 432.
 
 
 [99]
 Id. at 429.
 
 
 [100]
 Id. at 433, n. 11.
 
 
 [101]
 See, e.g., Harmsen v. Smith, 693 F.2d 932, 947 (9th Cir. 1982); Glovatorium Inc. v. NCR Corp., 684 F.2d 658, 663 (9th Cir. 1982) (citing Moore v. Green, 431 F.2d 584, 593-94 (9th Cir. 1970)). But see, e.g., Boyle v. Lorimar Productions., Inc., 13 F.3d 1357, 1360 (9th Cir. 1994) (approving, under Haslip, California's passion and prejudice standard because the jury was also instructed to apply other criteria, including reprehensibility and ratio of punitive damages to compensatory damages).
 
 
 [102]
 139 F.3d 1241, 1248 (9th Cir. 1998); see also Barnes v. Logan, 122 F.3d 820, 823-24 (9th Cir. 1997) (considering first if the punitive damages award was in manifest disregard of the law, then considering whether the award violated due process).
 
 
 [103]
 See 517 U.S. 559 (1996).
 
 
 [104]
 See id. at 574, 585-86.
 
 
 [105]
 See id. at 575-83.
 
 
 [106]
 121 S. Ct. 1678 (2001).
 
 
 [107]
 See id. at 1681-82.
 
 
 [108]
 Id. at 1687-89.
 
 
 [109]
 Id. at 1685-86.
 
 
 [110]
 Id. at 1688.
 
 
 [111]
 Id. at 1687-89.
 
 
 [112]
 Id. at 574, 585-86.
 
 
 [113]
 Id. at 562-63.
 
 
 [114]
 Id. at 565.
 
 
 [115]
 Id. at 567, 574-75.
 
 
 [116]
 Id. at 574-575.
 
 
 [117]
 Neibel v. Trans World Assurance Co., 108 F.3d 1123, 1131 (9th Cir. 1997); see also Pavon v. Swift Trans. Co., 192 F.3d 902, 909-10 (9th Cir. 1999); Ace v. Aetna Life Insurance Co., 139 F.3d 1241, 1248 (9th Cir. 1998).
 
 
 [118]
 Cooper Indus., Inc. v. Leatherman Tool, 121 S. Ct. at 1685 (2001) (citing BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996) (Breyer, J., concurring)).
 
 
 [119]
 Cf. id. at 1685-86.
 
 
 [120]
 Gertz v. Robert Welch, Inc. , 418 U.S. 323, 350 (1974).
 
 
 [121]
 BMW, 517 U.S. at 575.
 
 
 [122]
 Id. (citing Day v. Woodworth, 13 How. 363, 371 (1852)).
 
 
 [123]
 Id. (citing TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 453 (1993)).
 
 
 [124]
 Id. at 576.
 
 
 [125]
 Id. at 575-76 (quoting Solem v. Helm, 463 U.S. 277, 292-93 (1983)).
 
 
 [126]
 Id. at 576, 579; see also TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 460 (1993) (affirming an award of $10 million in punitive damages in a title dispute case involving trickery); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 6-7 (1991) (affirming a punitive damage award of not less than $840,000 million in a breach of contract case involving fraud); Neibel v. Trans World Assurance Co., 108 F.3d 1123, 1132 (9th Cir. 1997) (holding that punitive damages award was not excessive given that the defendants received warnings that the scheme was a scam and the fraud lured the plaintiffs to their financial ruin); Hopkins v. Dow Corning Corp., 33 F.3d 1116, 1127-28 (9th Cir. 1994) (affirming a $6.5 million punitive damages award because Dow exposed thousands of women to painful and debilitating disease, gained financially from its conduct, and knew of the possible defects but concealed the information for years).
 
 
 [127]
 Phase III Instruction 29.
 
 
 [128]
 Id.
 
 
 [129]
 Cf. Honda Motor Co. v. Oberg , 512 U.S. 415, 432 (1994) ("Punitive damages pose an acute danger of arbitrary deprivation of property, since jury instructions typically leave the jury with wide discretion in choosing amounts and since evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses.").
 
 
 [130]
 Protectus Alpha, 767 F.2d at 1381-1382.
 
 
 [131]
 103 F.3d 767, 771 (9th Cir. 1996).
 
 
 [132]
 BMW, 517 U.S. at 580.
 
 
 [133]
 Id.
 
 
 [134]
 See id. at 581. ("TXO, following dicta in Haslip, refined this analysis by confirming that the proper inquiry is `whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred.' ") (quoting TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 460 (1993)).
 
 
 [135]
 BMW, 517 U.S. at 581 (quoting TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 460 (1993)). Harm"likely" to occur is, of course, less than harm that is possible but unlikely to occur. Cf. Leatherman, 121 S. Ct. at 1688-89.
 
 
 [136]
 BMW, 517 U.S. at 576.
 
 
 [137]
 See BMW, 517 U.S. at 582-83; see also Boyle v. Lorimar Prods., Inc., 13 F.3d 1357, 1361 (9th Cir. 1994).
 
 
 [138]
 See id. at 583 (internal citation omitted).
 
 
 [139]
 Cf. Leatherman, 121 S. Ct. at 1688.
 
 
 [140]
 Order No. 267, at 13.
 
 
 [141]
 499 U.S. 1, 23 (1991).
 
 
 [142]
 Cf. Icicle Seafoods, Inc. v. Exxon Shipping Co., 229 F.3d 790, 795 (9th Cir. 2000); see also Baker v. Exxon, 239 F.3d 985, 988 (9th Cir. 2001).
 
 
 [143]
 Salvage of a vessel can be very difficult and expensive. See, e.g., Hendricks v. The Tug Gordan Gill, 737 F. Supp. 1099, 1101 (D. Alaska 1989).
 
 
 [144]
 BMW, 517 U.S. at 593 (Breyer, J., concurring).
 
 
 [145]
 Id. at 582.
 
 
 [146]
 Id. (internal citations omitted).
 
 
 [147]
 Id. at 583.
 
 
 [148]
 Leatherman, 121 S. Ct. at 1683.
 
 
 [149]
 18 U.S.C. &#167 3571(c).
 
 
 [150]
 18 U.S.C. &#167 3571(d).
 
 
 [151]
 Id.
 
 
 [152]
 43 U.S.C. &#167 1653(c)(1).
 
 
 [153]
 43 U.S.C. &#167 1653(c)(3).
 
 
 [154]
 33 U.S.C. &#167 1321(b)(7)
 
 
 [155]
 Id.; see also Thomas J. Schoenbaum, Admiralty and Maritime Law, vol. 2 418 (1987).
 
 
 [156]
 33 U.S.C. &#167 1321(b)(7)(D).
 
 
 [157]
 33 U.S.C. &#167 1321(a)(13) (" `barrel' means 42 United States gallons at 60 degrees Fahrenheit.").
 
 
 [158]
 517 U.S. 559 (1996).
 
 
 [159]
 121 S. Ct. 1678 (2001).
 
 
 [160]
 Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co., 206 F.3d 900, 906 (9th Cir. 2000).
 
 
 [161]
 Id. at 911 n.19; Diamond v. City of Taft, 215 F.3d 1052, 1055 (9th Cir. 2000).
 
 
 [162]
 Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir. 2000); Lambert v. Ackerly, 180 F.3d 997, 1012 (9th Cir. 1999) (en banc).
 
 
 [163]
 Stinnett v. Damson Oil Corp. , 813 F.2d 1394, 1398 (9th Cir. 1987).
 
 
 [164]
 Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 95 F.3d 1422, 1435 (9th Cir. 1996).
 
 
 [165]
 Id. (emphasis added).
 
 
 [166]
 51 F.3d 1421 (9th Cir. 1995).
 
 
 [167]
 29 F.3d 499 (9th Cir. 1994).
 
 
 [168]
 19 F.3d 677 (D.C. Cir. 1994).
 
 
 [169]
 Rebel Oil, 51 F.3d at 1429-30.
 
 
 [170]
 Claar, 29 F.3d at 500.
 
 
 [171]
 Lewis, 19 F.3d at 678.
 
 
 [172]
 Id. at 679, 680-82.
 
 
 [173]
 See Order No. 215, at 2-3.
 
 
 [174]
 Defenders of Wildlife v. Bernal, 204 F.3d 920, 927 (9th Cir. 2000).
 
 
 [175]
 United States v. Harrington , 923 F.2d 1371, 1374 (9th Cir. 1991).
 
 
 [176]
 See id.
 
 
 [177]
 656 F.2d 469 (9th Cir. 1981).
 
 
 [178]
 See id. at 472.
 
 
 [179]
 Cf. United States v. Blackwood, 878 F.2d 1200, 1202 (9th Cir. 1989) (finding Iran inapplicable where witness with personal knowledge provided extrinsic evidence to establish authenticity).
 
 
 [180]
 Id.; Ballou v. Henri Studios, Inc., 656 F.2d 1147, 1155 (5th Cir. 1981) (stating that claims of "alteration, contamination or adulteration" of blood samples that serve as the basis of blood tests to determine intoxication go to the "weight and not the admissibility of the evidence.").
 
 
 [181]
 AK R. Evid. 504(b).
 
 
 [182]
 AK R. Evid. 504(a)(4).
 
 
 [183]
 42 U.S.C. &#167 290dd-2(b)(2)(C).
 
 
 [184]
 275 U.S. 303 (1927).
 
 
 [185]
 501 F.2d 558 (9th Cir. 1974).
 
 
 [186]
 510 U.S. 443 (1994).
 
 
 [187]
 516 U.S. 199 (1996).
 
 
 [188]
 244 U.S. 205 (1917).
 
 
 [189]
 American Dredging, 510 U.S. at 447 (quoting Jensen, 244 U.S. 205); see also Yamaha, 516 U.S. at 211.
 
 
 [190]
 See American Dredging, 510 U.S. at 447 (applying this analysis).
 
 
 [191]
 See Ballard, 32 F.3d 623. The conclusion that contrary state law is not preempted by Robins has also been reached in the context of maritime oil spills by the Alaska Supreme Court and several district courts. See Kodiak Island Borough v. Exxon, 991 P.2d 757 (1999); Complaint of Nautilus Motor Tanker Co., Ltd., 900 F.Supp. 697 (D.N.J. 1995); Slaven v. BP America, Inc., 786 F.Supp. 853 (C.D.Cal. 1992).
 
 
 [192]
 See, e.g., Ballard, 32 F.3d at 627 (no act of Congress governed1989 spill); In re Nautilus, 900 F.Supp. at 702 (no act of Congress governed 1990 spill).
 
 
 [193]
 510 U.S. at 450.
 
 
 [194]
 Id.
 
 
 [195]
 Ballard, 32 F.3d at 627-28.
 
 
 [196]
 275 U.S. at 309.
 
 
 [197]
 Ballard, 32 F.3d at 628.
 
 
 [198]
 See Id.
 
 
 [199]
 State of Louisiana v. M/V Testbank, 752 F.2d 1019, 1022 (5th Cir. 1985) (en banc).
 
 
 [200]
 Jensen, 244 U.S. at 216.
 
 
 [201]
 Yamaha, 516 U.S. at 210-15; Ballard, 32 F.3d at 628 (citing Kossick v. United Fruit Co., 365 U.S. 731, 738-42 (1961)); Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 442-48 (1960)).
 
 
 [202]
 Kodiak, 991 P.2d at 768 (finding Robins Dry Dock does not preempt state law remedies).
 
 
 [203]
 Askew v. American Waterways Operators, Inc., 411 U.S. 325, 328-29 (1973) (describing oil spills as "an insidious form of pollution of vast concern to every coastal city or port and to all estuaries on which the life of the ocean and the lives of the coastal people are greatly dependent"); see also Huron, 362 U.S. at 442 (describing state air pollution laws as a classic example of police power allowing states to regulate maritime activities concurrently with the federal government).
 
 
 [204]
 Jensen, 244 U.S. at 216.
 
 
 [205]
 Ballard, 32 F.3d at 630.
 
 
 [206]
 Id. at 629.
 
 
 [207]
 Oil Pollution Act of 1990, 33 U.S.C &#167 &#167 2701-2718 (1990).
 
 
 [208]
 Trans-Alaska Pipeline Authorization Act, 43 U.S.C. &#167 &#167 1651-1656 (1994).
 
 
 [209]
 Ballard, 32 F.3d at 630-31.
 
 
 [210]
 Slaven v. BP America, Inc., 786 F.Supp. 853, 857-59 (C.D.Cal. 1992) (TAPAA repealed Robins Dry Dock, at least in part).
 
 
 [211]
 See 33 U.S.C. &#167 2718(a)(1990); 43 U.S.C. &#167 1653(c)(3) & (9) (1994).
 
 
 [212]
 Ballard, 32 F.3d at 630-31.
 
 
 [213]
 Kodiak, 991 P.2d at 769.
 
 
 [214]
 See id. at 759-65; Federal Deposit Ins. Corp. v. Laidlaw Transit, Inc., 21 P.3d 344 (Alaska 2001).
 
 
 [215]
 959 F.2d 805, 808 (9th Cir. 1992).
 
 
 [216]
 Benefiel, 959 F.2d at 808 ("[w]hile proximate or legal causation normally presents an issue for the trier of fact to resolve, both California and federal law recognize that where causation cannot reasonably be established under the facts alleged by a plaintiff, the question of proximate cause is one for the courts.").
 
 
 [217]
 Fed. R. Evid. 403; Defenders of Wildlife v. Bernal, 204 F.3d 920, 927 (9th Cir. 2000).
 
 
 [218]
 Fed. R. Evid. 403; Fed. R. Evid. 404.
 
 
 [219]
 Bernal, 204 F.3d at 927-28.
 
 
 [220]
 Cf. id. at 927; see also Fed. R. Evid. 403.
 
 
 [221]
 Beachy v. Boise Cascade Corp. , 191 F.3d 1010, 1013 (9th Cir. 1999), cert. denied, 120 S Ct. 1425 (2000).